STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Scott LEE, Defendant-Respondent.

Supreme Court

*No. 83–932–CR.  Argued November 27, 1984.—*
*Decided February 6, 1985.*

(Also reported in 362 N.W.2d 149.)

For the plaintiff-appellant-petitioner the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-respondent there was a brief and oral argument by *Ruth S. Downs,* assistant state public defender.

WILLIAM A. BABLITCH, J.   The State of Wisconsin (State) seeks review of a decision suppressing Scott Lee's inculpatory statement.   The court of appeals held that the police violated Lee's constitutional right to counsel by initiating communication with him, through his stepmother, after he invoked his right to counsel.

Because of the extent of police involvement in the actions of Lee's stepmother, we conclude that she was acting on behalf of the police in her efforts to elicit Lee's cooperation with the police. Inasmuch as Lee had already invoked his right to counsel and did not himself initiate communication with the police, he could not be subjected to further interrogation. Mrs. Lee's subsequent communication with her stepson was designed to elicit an incriminating response and therefore constituted interrogation. Accordingly, we affirm the court of appeals.

The facts following Scott Lee's arrest are critical to the disposition of this appeal and will be reviewed in some detail. The State concedes, based on the trial court's findings of facts, that to the extent there are conflicts in the evidence, Mrs. Lee's version of the incident is adopted as the one governing resolution of this appeal.

On September 25, 1982, at approximately 9:00 a.m., Scott Lee (Lee) surrendered to an Iowa county deputy who had been keeping him under surveillance throughout an unsuccessful narcotics transaction. Lee was advised of his *Miranda*[1] warnings by Deputy Robert Hille and indicated that he understood his rights. Hille then asked Lee: "[r]ealizing that you have these rights, are you now willing to answer questions or make a statement?" Lee answered "no," at which point all questioning stopped. At approximately 11:05 a.m., Lee telephoned an attorney who advised him not to make any statements to the police.

In the meantime, Scott Lee's stepmother, Charlene Lee (Mrs. Lee), was informed that he had been arrested. Mrs. Lee called the sheriff's office in an unsuccessful attempt to obtain information about Lee's situation. She then, at about 9:30 or 10:00 a.m., went to the sheriff's office and talked to Deputy Robert Krist who informed her that Lee had been arrested on a serious narcotics

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

charge. Krist would supply no additional information because the police were still trying to apprehend the person who was the narcotics supplier. Krist would not permit Mrs. Lee to see her stepson.

Mrs. Lee asked to speak to Deputy Larry Faull, whom she knew previously through family relationships. Faull was not available at the time, but Mrs. Lee left a message for him to call her. He did so about 11:30 a.m. or noon. Faull told Mrs. Lee that her stepson was in serious trouble, and could go to jail again for a number of years if convicted. Mrs. Lee asked if there was anything she could do to help Lee, to which Faull responded that he had to talk to the district attorney and would call her back.

Approximately twenty minutes later, Deputy Faull called Mrs. Lee again and reported that the district attorney would not make any deals with Lee because he had reneged on promises made to the district attorney in the past. However, Faull told Mrs. Lee that "they would go easier on him" if Lee cooperated. He told her the police wanted Lee to tell them from whom he was buying the marijuana. Faull also wanted Lee to assist in making a controlled buy from the supplier. Faull repeatedly told Mrs. Lee that "time was of the essence" because a buy could only be made before Lee's supplier learned that he was in custody.

Deputy Faull suggested to Mrs. Lee that she visit the jail and talk to Lee, but told her that no one else could accompany her. He also told her that he would call the dispatcher to give his permission for her to see Lee, given that it was outside of the normal visiting hours.

Lee was aware that he was seeing his stepmother outside of the normal visiting hours. Mrs. Lee apprised him of her conversations with Deputy Faull and indicated that Lee was in serious trouble and "was going to serve a lot of time if he didn't cooperate" with the police. She

advised him to talk to the police. Lee told her that he did not want to return to jail, but that his attorney had told him not to talk to the police. Mrs. Lee told him that he had "to make the decision, either to go [to prison or] to help the policeman out. . . ."

While Mrs. Lee was talking with Lee, Deputy Faull called the jail from his home and requested to speak with Mrs. Lee. Faull told her that "he was going to chop wood and [she] had ten minutes to talk Scott into talking and if Scott wouldn't go to talk, then he was going to go and chop wood." Lee was interested in learning more about what Faull had to offer him so he agreed to talk to Faull. Mrs. Lee then had the jailer call Faull at home to tell him that Lee was willing to talk.

Deputy Faull and Deputy Hille went to the jail shortly before three o'clock that afternoon. Lee was again advised of his *Miranda* warnings, but elected to give officers Hille and Faull the statement which was subsequently suppressed by the trial court.

When asked at the suppression hearing why he made a statement to the police, Lee answered: "because ther [sic] was some sort of a deal there." When asked about what his understanding of the deal was, Lee replied: "Well, I couldn't [know], I had to talk to him, to get it out of him, I couldn't [know], it wasn't coming from my step mom." He further testified that he did not hear about the proposed drug buy with his supplier until the interview with the officers had commenced. Deputy Faull told Mrs. Lee that she was permitted to participate in the taped interview. Faull further indicated that if at any time during the interview Mrs. Lee had anything to say, she should say it.

At the start of the interview, Lee asked if the tape recorder could be shut off for a minute so that he could clarify what their agreement was before making a statement. Deputy Hille explained that the tape recorder

had to be left on so that nothing would be hidden. He assured Lee that he would have access to the tape, and that if Lee did not like how things were going, his attorney could have a transcript of the interview. Deputy Faull assured Lee that by keeping the tape recorder on "[his attorney] can see everything that's said too just as if he's sitting there." Lee acknowledged that the officers promised him nothing, but agreed to talk with the officers because he believed, based on his stepmother's representations, that Faull was willing to make some sort of deal with him. In fact, at one point during the interrogation when Lee asked what benefits he was to receive for talking with them, Faull asked Mrs. Lee if she had anything to say.

On October 13, 1982, Lee was charged with conspiracy to deliver marijuana. He was bound over for trial following a preliminary hearing conducted November 17, 1982. On April 1, 1983, an evidentiary hearing was held on Lee's motion to suppress the inculpatory statement he made to the police the day of his arrest. On April 19, 1983, the Honorable Kent C. Houck entered an order suppressing this statement. The court found that Mrs. Lee had acted on behalf of the State and that therefore, the defendant's communication with the police was initiated by them in violation of *Edwards v. Arizona,* 451 U.S. 477 (1981). The State appealed this order to the court of appeals, which affirmed. *State v. Lee,* 119 Wis. 2d 355, 351 N.W.2d 755 (Ct. App. 1984). The State subsequently filed a petition for review which was granted by this court. The issues presented for review are:

(1) Was Lee's stepmother acting on behalf of the police in her efforts to elicit Lee's cooperation with the police? We conclude that under the totality of circumstances present, the actions of the stepmother were the effective equivalent of actions by the police.

(2) If so, must the incriminating statement obtained from Lee be suppressed? We conclude that the statement must be suppressed.

The standard of review by the appellate court of the trial court's finding of historical facts is that those findings will not be upset on appeal unless they are contrary to the great weight and clear preponderance of evidence. *State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984) ; *State v. Mazur,* 90 Wis. 2d 293, 309, 280 N.W.2d 194 (1979). This standard of review does not apply to the trial court's conclusion that Mrs. Lee acted on behalf of the State, for this involves a question of law. It is therefore subject to independent review by this court, and we need not give deference to the trial court's conclusion. *First Nat. Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). This court must also independently determine questions that involve the "application of constitutional principles to the facts as found. . . ." *Woods* at 715 (quoting *Mazur* at 309). *See Fare v. Michael C.,* 442 U.S. 707 (1979).

In this case, therefore, the trial court's findings of the historical facts surrounding the interrogation of Lee will not be overturned unless they are contrary to the great weight and clear preponderance of the evidence. We find that they are not. However, we must independently determine whether Mrs. Lee was acting on behalf of the State at the time she communicated with Lee and whether Lee's statement to the police must be suppressed.

*1. Was Lee's stepmother acting on behalf of the police in her efforts to elicit Lee's cooperation with the police?*

The State concedes that if this court finds that Mrs. Lee was acting on behalf of the police when she advised Lee to cooperate and talk to the police, the subsequent incriminating statements of Lee must be suppressed. The State argues, however, that Mrs. Lee voluntarily involved

herself in Lee's criminal investigation, and was not made an agent of the police merely because she was permitted to communicate information to Lee which she had received from the police and which convinced Lee to make an inculpatory statement. The State contends that the actions of Mrs. Lee, a private citizen, in eliciting an incriminating statement from Lee should not be deemed to be the effective equivalent of actions by the authorities.

Lee argues that the government involvement in Mrs. Lee's communication with her stepson was so extensive as to transform Mrs. Lee into an instrument of the police. Thus, he contends that her actions should be deemed to be the effective equivalent of actions by the police.

The point at which a citizen's communication can be attributed to the government "is not subject to any bright-line test." *Thomas v. Cox,* 708 F.2d 132, 136 (4th Cir.), *cert.* denied, 104 S. Ct. 284 (1983); *State v. Lowry,* 37 Or. App. 641, 588 P.2d 623, 630 (1978). A "gray area" clearly exists between extreme governmental participation in a citizen's interactions with an accused, and the complete absence of such participation. *United States v. Walther,* 652 F.2d 788, 791 (9th Cir. 1981). An inculpatory statement will be suppressed if the police intentionally create a situation, by directing, controlling or involving themselves in the questioning of a person in custody by use of a private citizen, which is likely to induce an accused to make incriminating statements without the assistance of counsel. *United States v. Henry,* 447 U.S. 264 (1980); *Massiah v. United States,* 377 U.S. 201 (1964). Conversely, a confession to the police will not be suppressed when prompted by the advice of a third party in the absence of influence by the authorities on these communications or if the influence is

only incidental. *See e.g., Cunningham v. State,* 248 Ga. 835, 286 S.E.2d 427 (1982) ; *State v. Rebstock,* 418 So. 2d 1306 (La. 1982), *cert. dismissed,* 459 U.S. 1190 (1983) ; *State v. Scott,* 626 S.W.2d 25 (Tenn. Cr. App. 1981) ; *Caffo v. State,* 279 S.E.2d 678 (Ga. 1981) ; *Com. v. Johnson,* 416 A.2d 1065 (Pa. Super. 1979) ; *State v. Snethen,* 245 N.W.2d 308 (Iowa 1976).

We conclude that the resolution of this case, and cases like it which fall in the "gray area," can best be effectuated on a case-by-case basis, by considering the totality of the circumstances present in each case. Because the fifth amendment restrains government action, the focus of our inquiry must be on the extent of government involvement in Mrs. Lee's conduct. *Surridge v. United States,* 687 F.2d 250, 253 (8th Cir.) *cert. den.* 103 S. Ct. 465 (1982). If police involvement is sufficiently extensive, the actions of the citizen will be treated as the effective equivalent of actions by the police. The question to be addressed in each case is whether the citizen was acting on behalf of the police. This is a question of law which must be reviewed independently by this court.

The state urges this court to develop a set of legal standards to guide the lower courts in deciding when a civilian becomes an agent of the police. Although each case must be decided on the basis of the totality of circumstances present, courts should consider a number of factors. The importance to be attached to each must be considered in light of all the facts present. Among those factors to be considered are the following: (1) whether it was the citizen or the police who initiated the first contact with the police, *e.g., Thomas* at 135; *Surridge* at 252; *State v. Schad,* 129 Ariz. 557, 633 P.2d 366, 374 (1981) ; (2) whether it was the citizen or the police who suggested the course of action that was to

be taken, *cf.*, *Thomas* at 135; *Surridge* at 252; *Schad* at 374–75; (3) whether it was the citizen or the police who suggested what was to be said to the suspect; in other words, was the citizen, in essence, a message carrier for the police, *cf.*, *Henry* at 271; *Thomas* at 135; *Surridge* at 252; *Schad* at 374–75; *Bottoson v. State*, 443 So. 2d 962 (Fla. 1983); (4) whether it was the citizen or the police who controlled the circumstances under which the citizen and the suspect met; whether the control was extensive or incidental, *e.g.*, *Henry* at 270; *Surridge* at 252; *Thomas* at 135.

In the present case, the Iowa county deputies did not initiate the first contact with Mrs. Lee. She telephoned the sheriff's office upon learning of her stepson's arrest to obtain information about his situation. When the call proved unsuccessful, Mrs. Lee went to the sheriff's office and spoke with Deputy Krist. Krist would not permit her to see Lee, so she left a message with Deputy Faull. Faull returned Mrs. Lee's message; he clearly did not initiate communication with her. We note that if the case stopped here, there would be no problem. The police routinely respond to inquiries of concerned individuals regarding another's arrest and routinely allow these individuals to visit those who are incarcerated. There is clearly nothing objectionable about this behavior.

Deputy Faull did, however, suggest the course of action to be taken by Mrs. Lee. Mrs. Lee's testimony from the suppression hearing clearly demonstrates that Faull suggested that Mrs. Lee go to the jail, as soon as possible, to talk to Lee. The following testimony is critical:

"Q. But it's Officer Faull who sent you to the jail to talk to Scott; isn't it?
"A. Yes.
". . . .

"Q. You told Officer Faull that you wanted to talk to Scott; didn't you?

"A. No. . . ."

Mrs. Lee had contacted Faull because she wanted to know what charges were pending against her stepson. It was Faull who suggested that Mrs. Lee go to the jail and talk to Lee. He also made it clear that she had to do so as soon as possible because "time was of the essence."

Additionally, Deputy Faull did suggest quite clearly what was to be said to Lee. He told Mrs. Lee that even though he was unable to work out a deal for Lee with the district attorney's office, things would go "easier" for Lee if he cooperated with the authorities. Faull told her that Lee was in serious trouble if he did not cooperate. He further indicated that "time was of the essence" because he wanted Lee to purchase drugs from the supplier before the supplier learned of Lee's arrest. Mrs. Lee did convey, quite literally, these messages to Lee. She told him that he was in serious trouble and was going to serve a lot of time in prison if he did not cooperate with the police. When Lee told his stepmother that his attorney had advised him not to talk to the police, she remarked that he had "to make the decision, either to go [to prison or] to help the policeman out. . . ." These words were echoes of Faull's statements to her. They were in fact the very messages which Faull suggested be said to Lee, and which the State concedes were designed to elicit an incriminating response from Lee.

While Mrs. Lee was talking to her stepson, Deputy Faull called her at the jail and warned her that she had ten minutes to talk Lee into talking, or that he was going to be unavailable chopping wood. Mrs. Lee repeated Faull's warnings. She advised Lee of the substance of the phone call and the time limitation that Faull attached to his cooperation.

Mrs. Lee's role as a message carrier for the police became evident again after the taped interview with Lee began. Deputy Faull not only invited Mrs. Lee to participate in the taped interview with Lee, but even suggested that, if at any time she had anything to say, she should just go ahead and say it. When Lee asked about what benefits he would receive for talking to the police, Faull asked Mrs. Lee if she had anything to say. Faull continued to use Mrs. Lee to articulate what he himself knew was impermissible to say, and which the State now concedes constituted interrogation. The conclusion is inescapable that Mrs. Lee became a message carrier for the police.

We find the conclusion equally indisputable that the police controlled the circumstances under which Mrs. Lee and her stepson met. After equipping Mrs. Lee with messages which he had every reason to assume she was going to convey, Deputy Faull arranged for Mrs. Lee to visit her stepson in jail, outside of the normal visiting hours. Faull called the dispatcher at the jail and made the necessary arrangements. Faull also continued to control the circumstances under which Mrs. Lee and her stepson met by imposing a time limitation upon which she had to secure Lee's cooperation. In so doing, Faull created additional pressure which clearly contributed to Lee's decision to change his mind and talk to the police, in contravention of the express advice of his attorney.

We conclude that the particular combination of factors involved in this case conclusively demonstrate that Mrs. Lee acted on behalf of the police in eliciting Lee's cooperation with them. The facts clearly demonstrate an intentional effort by the police to manipulate Mrs. Lee, through her concern and naiveté, to carry a message

to Lee that things would go better if he cooperated with the police and that "time was of the essence." The State concedes, and we agree, that the statements which Deputy Faull conveyed to Mrs. Lee and which she passed on to Lee were clearly calculated and likely to elicit an incriminating statement from Lee without the assistance of counsel. The police had tried once to get such a statement from Lee and had failed. Lee asked for a lawyer. The police could no longer question him. Any further communication with the police had to be initiated by Lee or through Lee's attorney. The police are not permitted to do indirectly through someone like Mrs. Lee that which they are constitutionally prohibited from doing themselves. The circumstances reveal a plan on the part of the police to use Mrs. Lee to do their bidding.

Mrs. Lee became the cat's-paw of the police.[2] Like the monkey in the fable, the police were aware that they would get "burned" if they went to see Lee inasmuch as Lee had already invoked his right to counsel. The police chose to utilize Mrs. Lee to pull their chestnuts from the fire, and to elicit a confession from Lee. Mrs. Lee, like the cat's-paw in the fable, was clearly the tool of another. She was acting on behalf of the police.

2. *Must the incriminating statement obtained from Lee be suppressed?*

It is undisputed that after his arrest, Lee invoked his fifth amendment right to counsel, and therefore under *Edwards* "[he was] not subject to further interrogation

---

[2] cat's-paw: "1. a person used by another to do dangerous, distasteful or unlawful work; dupe; tool: . . . ." *Webster's New World Dictionary*, 225 (D. Guralnick ed. 2d ed. 1972).

Cat's-paw alludes to an Aesop's Fable where a monkey, correctly perceiving that his paws would be burned if he himself reached into the fire to obtain some roasting chestnuts, prevailed upon his friend the cat to put its paw into the fire to pull out the roasting chest-nuts. The results were predictable.

by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. This is a "bright-line *per se* rule that will automatically result in the suppression of a statement, if the 'authorities . . . resume questioning after a defendant has asked for an attorney.'" *State v. Lampe*, 119 Wis. 2d 206, 213, 349 N.W.2d 677 (1984) (quoting *Solem v. Stumes*, 465 U.S. —— (1984)).

■

It is therefore equally impermissible for the State to use a citizen, acting on its behalf, to initiate interrogation of a suspect in custody. *See Surridge* at 253–55; *Scott* at 29. We therefore agree with the court of appeals' conclusion that "[i]f we affirm the trial court's finding that defendant's stepmother acted on behalf of the State when she convinced defendant to talk to the police, then we must find that the police initiated defendant's second communication, contrary to *Edwards*." *Lee* at 359.

We conclude that having exercised his right at the time of his arrest to have counsel present, Lee did not validly waive that right by responding to police-initiated interrogation, through his stepmother, after again being advised of his rights. Here, the interrogation of Lee was at the instance of the authorities and his confession, having been made without access to counsel, did not amount to a valid waiver of his fifth amendment right to counsel.

Unlike the monkey in the fable, the police cannot accomplish through Lee's stepmother something they would otherwise be unable to do acting on their own behalf. The statement was properly suppressed by the trial court.

*By the Court.*—The opinion of the court of appeals is affirmed.