STATE of Wisconsin, Plaintiff-Respondent,

v.

Craig KUNKEL, Defendant-Appellant.†

Court of Appeals

No. 85–2402–CR. Submitted on briefs July 8, 1986.— Decided February 5, 1987.

(Also reported in 404 N.W.2d 69.)

† Petition to review denied.

174

For the defendant-appellant the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette*, attorney general, and *David J. Becker*, assistant state public defender.

Before Gartzke, P.J., Dykman, and Eich, JJ.

GARTZKE, P.J.   Craig Kunkel was charged with the first-degree murder of his infant son. The case was never tried. He stipulated that his preliminary hearing and evidentiary hearings provided a sufficient factual basis for a finding that he committed the offense. He nevertheless pleaded not guilty by reason of mental disease or defect. After receiving medical testimony, the trial court found that Craig was not guilty by reason of mental disease. The court ordered him committed to the Department of Health and Social Services for custody, care and treatment until discharge, as provided in sec. 971.17, Stats. Kunkel appeals from the commitment order.

The first general issue is whether the trial court properly refused to suppress Craig's statements to the police and the physical evidence they obtained as a result of those statements. This issue turns on whether Craig's *Miranda* rights were violated and whether a "rescue doctrine" exception exists to the *Miranda*

requirements. We conclude that his *Miranda* rights were violated but because of the "rescue doctrine" exception, which we hold exists, Craig's statements and the physical evidence were admissible. The second issue is whether Craig's inculpatory statements were voluntary. We hold that because his statements were not the result of police coercion, they were voluntary. The third issue is whether Craig's right to counsel was violated. We hold it was not. The fourth issue is whether his statements to a priest were privileged and inadmissible under sec. 905.06, Stats. We hold that Craig's out-of-court statements were not privileged. The fifth issue is whether Craig's statements must be suppressed because the priest acted as the "tool" of the police. We hold that the priest was not a police agent. The last issue is whether information obtained by a warrantless search of Kunkel's luggage should be suppressed. We hold that because nothing was obtained by the search, the motion to suppress was properly denied.

We therefore affirm the commitment order.

## A. FACTS

Craig and Kathy Kunkel lived in Watertown with their 9-month-old son, Jason. About 4:30 p.m. on May 11, 1984, Kathy reported to Watertown Detective Quamme that Jason was missing from the Kunkel residence. When Kathy left for work at 9:00 a.m. that morning, Jason was with Craig, who was to deliver Jason to a neighborhood babysitter and then catch a bus to Wisconsin Rapids. The child never arrived at the babysitter's residence.

A man with five pieces of luggage had boarded a bus to Wisconsin Rapids but no one at the depot

remembered seeing a child. The child's clothing and bottles were still in the Kunkel residence. Quamme requested that the Wisconsin Rapids police contact Craig at the bus depot at 5:45 p.m. to ascertain Jason's whereabouts. Quamme called Craig's parents in Wisconsin Rapids at 6:15 p.m., but Craig had not yet arrived. At 7:30 p.m. Kathy reported that Craig had called and informed her that Jason was fine. Kathy did not appear concerned and seemed satisfied with her husband's explanation, but she wanted the matter investigated further.

Quamme then spoke with Craig by telephone. Craig said Jason was with a friend and was being well taken care of, but he would not identify the friend. Craig said that he advised Kathy of Jason's whereabouts and that Kathy was going to withdraw her complaint. Quamme told Craig that the investigation would continue until they located the child.

Sometime after 7:00 p.m., Quamme telephoned the district attorney and subsequently drew a complaint which Quamme said the district attorney approved by telephone. Between 10:00 and 11:00 p.m., Quamme presented the complaint and warrant to Judge Schumann at the judge's residence. The complaint charged Craig with interference with the parental rights of one parent by another parent, contrary to sec. 946.715, Stats. A warrant was issued for Craig's arrest. At 11:07 p.m. Wisconsin Rapids police were asked to arrest Craig pursuant to the warrant and to hold him for the Watertown police. Quamme and Detective Roets then drove to the Wood county jail in Wisconsin Rapids.

About 11:30 p.m., two Wisconsin Rapids police officers went to the residence of Craig's parents to arrest him. The officers had also been asked to locate

177

Craig's luggage. Craig was not at the residence. The officers asked Craig's father for permission to see Craig's luggage. The father agreed, searched the luggage, and found no sign of children's clothing. The officers did not have a search warrant.

Craig was arrested about 12:30 a.m. on May 12, several blocks away from his parent's residence in Wisconsin Rapids. About 2:00 a.m. Quamme and Roets began interrogation of Craig in Wisconsin Rapids. Before questioning Craig, Quamme read him his *Miranda* rights from a waiver form used by the Watertown Police Department. Quamme put the form in front of Craig so that he could view it. As Quamme read the form, he used a pencil to point at each word as he went down the line. The form consisted of separately stated *Miranda* admonitions followed by a waiver. After each admonition was read, Quamme asked Craig if he understood it. When Quamme received an affirmative response, he placed an X next to the admonition on the list.

The third admonition on the form advised Craig of his constitutional right to the services of an attorney to advise him, then or at any time he so desired, in connection with the investigation into his alleged criminal act or acts. When that admonition was read to him, Craig responded that he was unemployed and could not afford an attorney.

Rather than stop at this point, Quamme told Craig to listen to the fourth admonition. The fourth admonition states, "That if I do not have money to employ an attorney, all I need to do is to ask for one right now and the police will ask no questions until an attorney can be appointed for me by a judge at the expense of the county." After that admonition was read to him, Craig said he understood it. Detective

Quamme next read to him the final admonition, that he could decide at any time to exercise his rights and not answer any questions or make any statements.

Quamme then read to Craig the waiver part of the form, which stated:

> I hereby state that this waiver of my constitutional right to an attorney and constitutional right not to incriminate myself has been read to me by Det. Orval Quamme and I have read it myself and I understand fully what it means, and I further say that I now propose to make a statement or confession to the police or sheriff's department, and it is voluntary and made freely without threats or promises or mistreatment of any kind.

After hearing the waiver segment, Craig said he did not wish to make a confession. Detective Quamme told Craig he did not have to confess, and that Quamme only wanted Craig to understand his rights so that if he wanted to make a statement he could do so. At this point, Craig signed the waiver.

Quamme then asked where Jason was. Craig responded that Jason was with a friend but refused to say where or who the friend was. Craig was reluctant to speak and answered slowly. Because Craig appeared depressed and said he was a religious person, Detective Roets asked if it would help if he spoke to a priest. Craig said he wasn't sure but that possibly he would like to talk to a priest. At this point the officers decided to take Craig to Watertown.

Quamme, Roets and Craig left the Wood county jail for Watertown around 3:00 a.m. During the drive the officers continued to question Craig regarding Jason. Craig continued to refuse to disclose Jason's whereabouts. Craig and the officers arrived at the

Watertown jail about 5:30 a.m. on May 12. Craig was booked and questioned by four officers: Quamme, Roets, Officer Suko and Chief Reynolds. Craig repeatedly refused to disclose Jason's whereabouts, saying only that Jason was safe and with good friends. Craig said he was seeing a psychiatrist, was being counseled, and was taking medication for nervousness.

Between 7:30 and 7:45 a.m. Craig said: 'I thought you were going to get me a priest.'' The police contacted a priest, and told him that they were attempting to locate a nine-month-old boy, feared foul play, and that the child's father wanted to speak to a priest. The priest came to the interview room, and after a ten or fifteen minute conversation, the priest and Craig left the room and met the officers in the hallway. The priest said that Craig would take them to where Jason was and that the child was dead. Craig said nothing in the hallway.

The police questioned Craig further regarding Jason's whereabouts. Craig said that Jason was in a wooded area in Wisconsin Rapids, but refused to pinpoint the location.

Officers Suko and Quamme and Craig subsequently left for Wisconsin Rapids, where they met with local officers. Craig then led the officers to a wooded area where he pointed out Jason's grave. The officers testified that without Craig's assistance it was unlikely that they could have found the grave site.

About 2:15 p.m. on May 12 Officer Quamme and Wisconsin Rapids Detective Exner began further interrogation of Craig at the Wood county jail. When he was again advised of his rights, Craig said he did not know how he was going to pay for his attorney because he had no money or job. Quamme responded that if he did not have money the court would appoint

counsel at state expense. Quamme made no effort to obtain an attorney for Craig at that time. After advising Craig of his rights, Quamme said they had found Jason and wanted to talk with him about that. Craig answered, "I don't know." Quamme asked whether the tape recorder was bothering Craig. The recorder was turned off and questioning resumed.

Two days later, May 14, a Watertown officer signed a criminal complaint charging Craig with first-degree murder, sec. 940.01(1), Stats.

Craig moved to suppress his statements and the physical evidence on grounds that the Watertown police violated his fifth and sixth amendment rights when the police continued to question him after Craig told Quamme early May 12 that he was unemployed and could not afford an attorney. The trial court held that the questioning should have stopped at that point. The court concluded, however, that the "rescue doctrine" justified further questioning, since until the child's body was found, the rights of the missing child were paramount to Craig's right not to incriminate himself. The court held that the priest's statements to the police as he and Craig left the interrogation room were not privileged and whether the priest was a police agent was immaterial. The court therefore refused to suppress Craig's statements to the priest and the child's body as evidence. The court held that the warrantless search of Craig's luggage violated his constitutional right against unreasonable search and seizure, but because the police found nothing in the luggage, the violation was immaterial.

## B.  *MIRANDA* RIGHTS

■
An accused person in custody has an absolute right to have counsel present during questioning.

181

*Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Once an accused invokes the right to counsel, questioning of the accused must stop until counsel is present, unless the accused initiates further conversation. *Id.* These and other procedural safeguards created by the *Miranda* court are "not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).

*Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), further developed the *Miranda* right to counsel. The *Edwards* court adopted the rigid rule that if an accused invokes the right to counsel, he is not subject to further interrogation until counsel is made available, unless he validly waives the earlier request for counsel. *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984).

1. *Invocation of Right to Counsel*

The state challenges the trial court's conclusion that defendant invoked his *Miranda* right to counsel when, in response to the admonition that he was entitled to the services of an attorney, Craig said that he was unemployed and could not afford one. The state asserts that because Detective Quamme immediately followed that response by informing Craig of his right to counsel at county expense, and Craig dropped the subject and proceeded to waive his rights, his statement about not being able to afford an attorney cannot be viewed as an invocation of his right to counsel. We disagree.

The right to counsel issue here arises out of the protection against self-incrimination under the fifth and fourteenth amendments, not the sixth amendment. *See United States v. Gouveia*, 467 U.S. 180, 188

(1984). Craig's separate sixth amendment claim is discussed in Part D of this opinion.

The historical facts surrounding Craig's *Miranda* warnings and his responses are undisputed. Whether he invoked his right to counsel is therefore a question of law. We decide questions of law independent of the trial court's decision. *State v. Griffin,* 131 Wis. 2d 41, 49, 388 N.W.2d 535, 537 (1986).

■

An invocation of the right to counsel does not require an explicit, unequivocal or unmistakable expression of the desire for an attorney. In *Micale v. State,* 76 Wis. 2d 370, 373, 251 N.W.2d 458, 460 (1977), our supreme court held that an accused invoked the right by telling the interrogating officer that he could not afford an attorney. We reached a similar conclusion in *State v. Wegner,* 118 Wis. 2d 419, 425, 348 N.W.2d 603, 606 (Ct. App. 1984).

The state contends that a critical distinction exists between the facts in *Micale* and *Wegner, supra,* on the one hand, and the facts in this case. In *Micale* and *Wegner* the statement came after *Miranda* warnings had been fully given and the police were attempting to secure a waiver of *Miranda* rights. Craig's statement that he could not afford an attorney came roughly in the middle of serially stated *Miranda* rights.

The distinction is made immaterial by *Smith v. Illinois,* 469 U.S. 91 (1984). In *Smith,* the defendant was told he had a right to consult with and have a lawyer present. When asked if he understood, he responded, "Uh, yeah, I'd like to do that." Rather than immediately terminating questioning, the police read to defendant his other *Miranda* rights, pressed him again to say whether he wanted an attorney, and told

him that if he did and could not pay for one, a lawyer would be appointed to represent him free of cost. Defendant then agreed to talk to the police. The *Smith* Court held that the initial response, "I'd like to do that," invoked the right to counsel.

We conclude that Craig invoked his right to counsel when he said in the middle of his *Miranda* admonitions that he could not afford counsel. The *Edwards* rule required the police to stop further interrogation. The trial court correctly held that all subsequent statements by Craig to the interrogating police were inadmissible, unless an exception exists to the *Miranda* rule by virtue of the so-called "rescue doctrine."

2. *Rescue Exception to Miranda Requirements*

The California courts have developed a "rescue doctrine" as an exception to the *Miranda* rule. The exception and its history are reviewed in *People v. Willis,* 104 Cal. App. 3d 433 (1980). In that case, the victim was last seen about 3:45 p.m. March 14, 1977. Police investigation led to defendant's arrest in the early morning hours of March 15, 1977. Defendant was given and refused to waive his *Miranda* rights, but after the police persisted, he waived his rights and made several incriminating statements. Relying on the "rescue doctrine," the trial court refused to grant defendant's motion to suppress his statements.

As described in *Willis, supra,* the "rescue doctrine" was first recognized in California in *People v. Modesto,* 398 P.2d 753 (1965), which was decided prior to the *Miranda* decision in 1966.

The doctrine is a particular species of "exigent circumstances." Simply stated, the "rescue doctrine" is to the effect that, where the interrogation of a suspect is undertaken by the police for the paramount reason that information is being sought to save a life, the interrogating officers are justified in "not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel" [quoting from *Modesto,* 398 P.2d at 759]. The interest in saving a human life is considered to be outside of the parameters of the constitutional protection afforded against self-incrimination.

104 Cal. App. 3d at 447–48.

██

Later California decisions have applied *Modesto.* According to *People v. Dean,* 39 Cal. App. 3d 875, 882 (Cal. App. 1974), "[w]hile life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." In *People v. Riddle,* 83 Cal. App. 3d 563, 572 (Cal. App. 1978), the court said that "[t]he most pressing emergency of all is rescue of human life when time is of the essence" and that "an emergency sufficient to excuse the *Miranda* requirements contains the following elements: 1. urgency of need in that no other course of action promises relief; 2. the possibility of saving human life by rescuing a person whose life is in danger; 3. rescue as the primary purpose and motive of the interrogators." 83 Cal. App. 3d at 576.

██

The trial court's factual findings fulfill the elements of the "rescue doctrine" as set forth in *People v. Riddle, supra.* The trial court found that the police faced time constraints since the missing child was

nine months old and conversations with Craig did not occur until after midnight. Urgency of need existed. Because Craig was the only source for the information the police sought, interrogation was the only course of action promising relief. Obtaining information from Craig regarding the whereabouts of the child created the possibility of saving a human life. The court found that the police perceived the existence of a genuine emergency and a concern that the child might be alive and in need of assistance. The court added that a reasonable person would have believed an immediate need existed to determine the whereabouts of the child to provide aid and assistance to him. The officers acted in a reasonable manner in continuing to try to determine the condition and location of the child.[1]

Because the elements of the "rescue doctrine" have been met, the question is whether the doctrine is an exception to the *Miranda* requirements. The scope of *Miranda* has been clarified by *New York v. Quarles*, 467 U.S. 649 (1984). We conclude on the basis of *Quarles* that the "rescue doctrine" is an exception to the *Miranda* requirements.

The facts in *Quarles* are as follows: A woman told police that she had just been raped, that the man had run into a nearby supermarket, and that he had a gun. When an officer entered the store, Quarles fled to the rear. The officer pursued and finally stopped him.

[1]In *People v. Manning,* 672 P.2d 499 (Colo. 1983), the Colorado Supreme Court declined to adopt the rescue doctrine when parent held in custody for contempt during 14 weeks her child was missing responded to police questions only when told she would be treated as a witness and not a suspect. The court reasoned that the police's long-standing concern for the missing child "was simply not the same" as the sense of urgency that permeated police activities in *Modesto* and *Riddle.* 672 P.2d at 511.

By that time three more officers had arrived. They frisked Quarles and found that he had an empty shoulder holster. After handcuffing Quarles and before giving him *Miranda* warnings, an officer asked him where the gun was. Quarles nodded in the direction of some cartons and said, "The gun is over there." 467 U.S. at 652.

The *Quarles* court held that on the facts before it, "there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved."[2] 467 U.S. 655–56. The *Quarles* court reached that conclusion by identifying and weighing different benefits against the social cost of freeing a criminal suspect.

The *Quarles* court said that the *Miranda* decision was based largely on the view that mandatory police warnings to suspects would reduce the likelihood that suspects would fall victim to impermissible practices of police interrogation. The *Miranda* majority apparently had felt that whatever the cost to society in terms of fewer convictions of guilty suspects, that cost must be borne. The *Quarles* court concluded "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting fifth amendment privilege against self-incrimination." 467 U.S. at 657. The *Quarles* court therefore held that the statement that

---

[2]The California rescue doctrine contains a subjective element: that rescue is the primary purpose and motive of the police. *People v. Riddle,* 83 Cal. App. 3d at 577. The *Quarles* exception rests on an objective test.

"the gun is over there" and the gun itself need not be excluded from evidence.

The facts before us differ, of course, from those in *New York v. Quarles, supra.* In *Quarles* the police questioned the suspect before advising him of his rights. Here the police informed Craig of his right to counsel and then disregarded that right after he invoked it. Because under *Edwards, supra,* we must treat the facts as if the police completely failed to give Craig the *Miranda* warnings before questioning him, the distinction is immaterial. The *Quarles* court dealt with failure to read *Miranda* rights to a defendant when the circumstances were, "kaleidoscopic." 467 U.S. at 656. Here the Watertown police faced a more calm and clear picture, whatever its blanks. The "kaleidoscopic" nature of the circumstances, however, affected only the reasonableness of the police reaction. The trial court concluded that the police acted reasonably, and we agree.

The overriding similarity between the facts in *Quarles* and those before us is a danger to life which must be weighed against the risk that a guilty suspect might eventually go free. The *Quarles* court weighed the public safety against that risk. We must weigh a possible imminent loss of a known person's life against the risk that a guilty suspect might be freed for want of evidence obtained from the suspect's own lips.

For it was indeed the possible imminent loss of a life, or so it could reasonably seem to the Watertown police, were they to honor Craig's *Miranda* right to counsel. When Craig's interrogation began, the police knew a nine-month-old child had been missing for about seventeen hours, none of the child's clothing or food was taken, and although the father claimed the

child was safe, he had refused to say with whom or where the child was.

The companion to the public safety exception must be a private safety exception, whether labelled as such or as a "rescue doctrine." In our calculus the possible imminent loss of the life of a known and identifiable individual is entitled to the same weight as the public safety. If on the facts before it, the *Quarles* court could conclude that the need for answers to protect the public safety outweighed the need for *Miranda* warnings, then surely, on the facts before us, it is reasonable to conclude that the need for answers to protect the life of one person outweights the same need.

In short, we conclude that the police need not choose between forfeiting the opportunity to save an individual from possible and imminent loss of life and forfeiting the right to obtain evidence from a suspect in custody. The rescue doctrine spells out a limited exception to the *Miranda* procedural safeguards. Because the elements of the doctrine have been satisfied, Craig's statements to the police and the resulting physical evidence they obtained are admissible, notwithstanding noncompliance with the *Miranda* rules.

3. *Rescue Doctrine—State Constitution*

Craig asks that we reject the rescue exception to the *Miranda* requirements as a matter of state constitutional law. He relies Wis. Const. art. I, sec. 8, subsec. 1, which provides that no person may be compelled in any criminal case to be a witness against himself or herself. We decline to reject the rescue doctrine on state constitutional principles.

Perhaps the *Miranda* court could have concluded that the safeguards it adopted are implicit in the

federal constitutional right against self-incrimination, but the court did not choose that route. The *Miranda* rule consists of procedural safeguards developed to protect the right against self-incrimination guaranteed by the fifth and fourteenth amendments to the United States Constitution. The *Miranda* safeguards are not, by themselves, constitutional rights. *Michigan v. Tucker,* 417 U.S. 433, 444 (1974).[3]

The Wisconsin Supreme Court has never adopted (or rejected) the *Miranda* rule, either as implicit in the state constitutional right against self-incrimination or as a means to safeguard that right. We need not decide whether an exception exists to an implicit state constitutional right or to a procedural safeguard for such right, when neither ruling has yet been announced or adopted by the Wisconsin Supreme Court.

## C. VOLUNTARINESS OF STATEMENTS

Craig moved to suppress his inculpatory statements because they were made involuntarily in violation of his fifth, sixth and fourteenth amendments to the United States constitution, as set forth in *Miranda v. Arizona,* 384 U.S. 436 (1966), and *Edwards v. Arizona,* 451 U.S. 477 (1981); and *Jackson v. Denno,* 378 U.S. 368 (1964).

Because, however, the rescue doctrine applies, Craig was not entitled to the procedural safeguards of *Miranda. Edwards v. Arizona, supra,* is an outgrowth of *Miranda.* We therefore pursue Craig's fifth amend-

---

[3] The *Miranda* court found it impossible to "foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States ..." and the decision "in no way creates a constitutional straitjacket which will handicap sound efforts at reform." 384 U.S. at 467.

ment contention no further. We deal with the sixth amendment issue in Part D of this opinion.

Craig's reference to *Jackson v. Denno, supra,* invokes a due process concern under the fourteenth amendment. *Jackson v. Denno,* 378 U.S. at 386–87, rests upon the proposition that:

> the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a confession, wrings a confession out of an accused against his will," *Blackburn v. Alabama,* 361 U.S. 199, 206–07, and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York,* 360 U.S. 315, 320–21.

We immediately dispose of the reliability issue. The reliability of Craig's inculpatory statements has been established beyond a doubt. They led the police to the child's grave.

We turn to the six factors Craig relies upon to show his statements were involuntary: first, the police gave him no opportunity to speak to counsel; second, they interrogated him after he refused to disclose his son's whereabouts; third, he suffered from a mental disease; fourth, he had no prior experience with police questioning; fifth, he had little sleep; sixth, the police took advantage of his religious nature by suggesting he speak to a priest.

For purposes of due process analysis under the fifth and fourteenth amendments, involuntariness requires police coercion. *Colorado v. Connelly,* 55 L.W. 4043, 4045 (1986). The fact is that if the police attempted to coerce Craig, he successfully resisted. He confessed to the priest, not to the police. His subsequent statements to the police simply confirmed and elaborated on his statements to the priest which had been disclosed to the police.

It is true, of course, that had the police used the priest to coerce a statement from Craig, their use of a third person for that purpose would have constituted police coercion. *Compare State v. Lee,* 122 Wis. 2d 266, 275, 362 N.W.2d 149, 153 (1985) (statement unlawfully procured by police through police agent must be suppressed). No evidence exists, however, that the priest coerced a statement from Craig.[4] The record, moreover, is devoid of evidence that the police even asked the priest for assistance in obtaining a confession from Craig. No officer testified that the police asked the priest for assistance. The priest testified that the police did not expressly or impliedly seek his assistance. He testified that the only implication he drew from what the police told him was that Craig wanted to talk to a priest.

## D. SIXTH AMENDMENT RIGHT TO COUNSEL

Craig contends that the police denied him his sixth amendment right to counsel. He contends that he was denied that right by being questioned without counsel after a complaint had issued charging him with a crime.

---

[4]The clergyman privilege is addressed in Part E, *infra.*

The right to counsel is guaranteed under the sixth and fourteenth amendments. *Brewer v. Williams,* 430 U.S. 387, 398 (1977). The right attaches at or after the time adversary judicial proceedings have been initiated against the accused, whether by formal charge, indictment, information or arraignment. *Id.* Craig's sixth amendment right to counsel therefore attached on May 11, 1984 when Judge Schumann approved the complaint and signed the warrant for his arrest. It was on May 12 that Craig was interrogated without counsel and discussed the location of his child's grave.

Craig's right to counsel attached, however, only to the charge in the May 11 complaint. That charge was limited to interference with the parental rights of one parent by another parent, sec. 946.715, Stats. The first-degree murder charge was alleged in a criminal complaint filed on May 14, 1984, two days after the interrogation which Craig claims violated his right to counsel.

The right to counsel arising out of a charged crime does not attach to another crime until it has been charged. "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not attached are, of course, admissible at a trial of those offenses." *Main v. Moulton,* 474 U.S. —, 88 L. Ed. 481, 499 n. 16 (1985). A rule to the contrary "would unnecessarily frustrate the public's interest in the investigation of criminal activities." *Id.* at 498.

## E. PRIVILEGED COMMUNICATION

Craig contends that "obviously" his private conversation with the priest in the interview with the

Watertown Police Department was a privileged communication. Section 905.06(2), Stats., provides, "A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as a spiritual adviser."

Craig concludes that because it was released in violation of Craig's clergyman privilege, the information the priest gave to the Watertown police should have been suppressed. He contends that the prosecution failed to prove that he had waived privilege and that the trial court should have allowed him to question the priest on his authority to make the challenged disclosures. We reject his contentions.

The clergyman privilege, sec. 905.06(2), Stats., is a rule of evidence. As such, it applies "at all stages of all actions, cases and proceedings." Section 911.01(3), Stats. The privilege therefore does not apply to communications made outside an action, case or proceeding. As said in *Muetze v. State,* 73 Wis. 2d 117, 125, 243 N.W.2d 393, 396–97 (1976),

> Law enforcement authorities are not prohibited thereby from using such [privileged] disclosures as a source of other evidence or information. It is only where the communications themselves ... are sought to be admitted into evidence in a judicial proceeding that the rule of exclusion applies. [Footnote omitted.]

Craig nevertheless relies on the *Muetze* court's broad statement that "a communication which is privileged when made remains so, regardless of an unauthorized out-of-court disclosure." 73 Wis. 2d at 129–30, 243 N.W.2d at 399. That statement must be understood in its context. The question before the

*Muetze* court was whether an unauthorized out-of-court disclosure of a privileged communication may be used in a judicial proceeding to obtain a search warrant. The *Muetze* court held that such use could not be made.

Here the law enforcement authorities used the privileged statement (assuming it to be such) as a source of other information and evidence: the child's death and the child's body. The priest's disclosures were not used in a judicial proceeding.

Because we conclude that the clergyman privilege is inapplicable to the out-of-court disclosures by the priest to the police, we need not decide whether the disclosures were indeed privileged under sec. 905.06(2), Stats., or resolve the other issues raised in this connection with the disclosures.

### F. PRIEST AS POLICE AGENT

Craig relies on *State v. Lee,* 122 Wis. 2d 266, 362 N.W.2d 149 (1985), for the proposition that an inculpatory statement will be suppressed "if the police intentionally create a situation, by directing, controlling or involving themselves in the questioning of a person in custody by use of a private citizen, which is likely to induce an accused to make incriminating statements without the assistance of counsel." 122 Wis. 2d at 275, 362 N.W.2d at 153.

The holding in *State v. Lee, supra,* is narrower than the quoted statement suggests. Because Lee had invoked his *Miranda* right to counsel, he could not be further interrogated without counsel, unless Lee himself initiated further communication with the police. *Edwards v. Arizona,* 451 U.S. 477 (1981). The police

used Lee's stepmother to convince him to communicate with the police. That use violated Lee's *Miranda* rights.

*State v.. Lee, supra,* is inapplicable. The rescue exception to *Miranda* requirements applies. The failure of the police to honor Craig's *Miranda* right to counsel therefore does not affect the admissibility of his statements.

## G. WARRANTLESS SEARCH OF LUGGAGE

Craig complains that the warrantless search of his luggage at his parents' house was invalid and therefore the fruits of the search must be suppressed. Rather than argue the point raised, the state notes that the search produced no incriminating evidence and therefore argues that the legality of the search is moot. Not so, replies Craig, since the prosecution might want to show what was *not* in the luggage. But Craig has not shown that the prosecution indeed used that fact. We agree that the validity of the search is a moot issue.

*By the Court.*—Order of commitment affirmed.