STATE of Wisconsin, Plaintiff-Respondent,

v.

Corey J. UHLENBERG, Defendant-Appellant.

Court of Appeals

*No. 2012AP827–CR. Submitted on briefs February 21, 2013.
—Decided April 3, 2013.*

2013 WI App 59

(Also reported in 831 N.W.2d 799.)

44

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Warren D. Weinstein*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Reilly and Gundrum, JJ.

¶ 1. BROWN, C.J. Corey J. Uhlenberg challenges his conviction for second-degree sexual assault of a child under the age of sixteen, contrary to WIS. STAT. § 948.02(2) (2011–12).[1] Uhlenberg pled guilty to the charge after the circuit court denied his motion to suppress a number of incriminating statements that Uhlenberg made at the West Bend police department. The circuit court concluded that Uhlenberg was not in "custody" at the police department. We conclude that under the circumstances, a reasonable person in Uhlenberg's position would not have believed he was free to leave the locked interview room at the police station and that therefore Uhlenberg was "in custody" during the interview. So the court should have suppressed the statements Uhlenberg made during the

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

interrogation after requesting his attorney. However, the court correctly ruled that other incriminating statements Uhlenberg made while not being interrogated are admissible. We reverse and remand for further proceedings.

## Background

¶ 2. The criminal case against Uhlenberg arose because of statements a five-year-old girl made after a sleepover at Uhlenberg's house. The girl was friends with Uhlenberg's young children. When the girl made statements to her mother about Uhlenberg's sexual touching, she notified police, who investigated. After gathering information from the girl and her mother, investigators went to Uhlenberg's home to ask him "to come down to the police department for questioning." Uhlenberg was not "given [the] option" of driving himself but instead was handcuffed and transported by police in the back of a squad car.[2] At the police department, an officer took Uhlenberg into the secure booking area and seated him in a locked interview room, where his handcuffs were removed. The department contains other interview rooms in a nonsecure area, but Uhlenberg was placed in a locked room within the section of the department from which no one can enter or exit without police approval.

¶ 3. Uhlenberg waited in the locked interview room for ten or fifteen minutes before a detective arrived to interview him. When Uhlenberg asked to get a drink of water, the detective unlocked the door, with his electronic key, escorted him to the drinking foun-

---

[2] Uhlenberg made some statements in the squad car but on appeal has abandoned his challenge to the admissibility of those statements.

48

tain, and then brought him back to the locked room in the secure area. A recording was made of the entire interview. The detective told Uhlenberg that he was not under arrest, but when he began to read the *Miranda*[3] warnings to Uhlenberg, Uhlenberg interrupted him, stating that he wanted to call his wife, but the detective ignored that request. Despite the detective's reassurances that he was not under arrest, Uhlenberg repeatedly asked questions about his status and the rest of the investigation, such as whether his home was being searched. Uhlenberg then said, "I am not going to say another word, and I want an attorney. I am really afraid." The detective did not stop the interview. He said, "I simply want to talk to you about what happened last night." He then began reading the *Miranda* warnings again and had Uhlenberg sign the *Miranda* rights waiver form. The detective then engaged Uhlenberg in more conversation about whether he wanted an attorney present, and in response to the continued interrogation Uhlenberg eventually made numerous statements incriminating himself in the sexual assault of which he was accused.

¶ 4. Shortly after this interrogation was completed, Uhlenberg was left alone in the interview room. An officer watching Uhlenberg on a monitor saw him removing his shoelaces. The officer rushed to the room and found Uhlenberg holding one of the laces as if he was going to strangle himself with it. The officer asked Uhlenberg what he was doing with the shoelaces, and Uhlenberg said he wanted to kill himself and asked the officer to shoot him. The officer took away Uhlenberg's shoes and laces and told the detective who had interrogated Uhlenberg about the apparent suicide attempt.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 5. After the shoelaces incident, the detective placed Uhlenberg in a different room in the secure area, near the officer who had rushed in to stop Uhlenberg from harming himself. Uhlenberg was allowed to call his wife at this time. He made the call without asking for privacy and spoke at normal volume within the hearing range of the officer standing nearby. The officer overheard numerous incriminating statements Uhlenberg made during that call, including "I did some things, but I didn't hurt her," and "[And] she kind of came on to me, you know. In a moment of weakness I did some things . . . ."[4] After that phone call, Uhlenberg was taken to jail.

¶ 6. Uhlenberg moved to suppress the statements made during the interview, after his request for counsel, on the grounds that the statements were made in response to custodial interrogation that continued after he had unambiguously requested counsel. He also moved to suppress statements he made during the shoelace incident, the phone call with his wife, and the squad car transport to the police department. The circuit court denied all of the motions, holding that Uhlenberg was not "in custody" while being interviewed at the station, and that the other statements were not made in response to interrogation.

¶ 7. Uhlenberg subsequently pled guilty to a charge of second-degree sexual assault of a minor under the age of sixteen and appeals the denial of his suppression motions. On appeal, Uhlenberg no longer challenges the admissibility of his admissions of guilt dur-

---

[4] The call was also recorded. The officer testified that the transcript of that recording was completely consistent with his memory of what Uhlenberg said.

ing the phone call with his wife[5] or the statements he made in the squad car. But he continues to argue that all statements he made in response to questions after invoking his right to counsel must be suppressed—i.e., both his statements during the interview and his statements during the shoelaces incident.

*Analysis*

¶ 8. A person suspected of a crime has the right to remain silent and cannot be compelled to incriminate himself or herself. *State v. Martin*, 2012 WI 96, ¶¶ 30–31, 343 Wis. 2d 278, 816 N.W.2d 270. The purpose of the *Miranda* rule requiring police to advise suspects of these rights is to ensure that suspects know about their rights before responding to custodial interrogation. *Martin*, 343 Wis. 2d 278, ¶ 31. Once a person has invoked the right to counsel during custodial interrogation, police cannot initiate any more questioning until the person's attorney is present. *State v. Stevens*, 2012 WI 97, ¶ 53, 343 Wis. 2d 157, 822 N.W.2d 79.

¶ 9. In this appeal, the State concedes that (as the circuit court held) the "interview" with Uhlenberg at the police department was interrogation and that a few minutes into that interview, Uhlenberg unequivocally invoked his right to remain silent and his right to

---

[5] Though Uhlenberg no longer challenges the ruling that his statements made in the phone call were not in response to interrogation, he suggests that the recording of the phone call and the transcript of that recording may be inadmissible because they were made in violation of the Wisconsin law requiring consent before recording. The State in its response brief says nothing about the recording and, in any case, the officer heard everything Uhlenberg said. So we do not address any issue regarding the recording law.

counsel, when he said, "I am not going to say another word, and I want an attorney." *See also Saeger v. Champagne*, No. 12–C-188, 2013 WL 812547, at *2, *8 (E.D. Wis. March 5, 2013) (holding that "I got nothin[g] more to say to you. I'm done. This is over" was an unambiguous invocation of the right to remain silent).

¶ 10. So the only issue before us is whether Uhlenberg was in "custody" at the time of the questioning. Whether a suspect is in "custody" depends upon whether, under the totality of the circumstances, a reasonable person would have felt that he or she was free to end the interview and leave the police department. *Martin*, 343 Wis. 2d 278, ¶¶ 33, 35. If the suspect has been placed under formal arrest, we need not examine any other factors, because formal arrest always equals "custody." *Id.* at ¶ 35. In the absence of a formal arrest, however, we must consider all of the relevant circumstances, including the purpose of the interrogation, where it takes place, whether the suspect is free to leave, and the degree and nature of any restraint. *State v. Mosher*, 221 Wis. 2d 203, 211, 584 N.W.2d 553 (Ct. App. 1998). A two-part standard of review applies: we uphold the circuit court's findings of historical fact unless clearly erroneous, but we review de novo the ultimate legal question of whether under the circumstances the suspect was subject to custodial interrogation despite invoking his right to counsel. *Id.*

¶ 11. Throughout its arguments, the State emphasizes the fact that the detective repeatedly told Uhlenberg that he was not under arrest. But while an arrest would mean that a suspect is in "custody," lack of an arrest does not end the inquiry. The analysis asks whether a reasonable person would have felt free to end

the questioning and leave the scene. *Martin*, 343 Wis. 2d 278, ¶ 33. In this case, the totality of the circumstances would have led a reasonable person in Uhlenberg's position to conclude he was in custody. To begin with, the officers' purpose in contacting Uhlenberg and their conduct and statements in transporting him to the police department created the impression that Uhlenberg was under their control. Officers, in the midst of investigating the girl's complaint that Uhlenberg touched her sexually the night before, came to Uhlenberg's home, found him in the kitchen washing dishes, and told him he "needed" to come with them to the police station. The stated purpose of bringing Uhlenberg to the department for the interview was to get his side of the story. The need to come to the police department was not presented as optional to Uhlenberg, and he was not given the option to drive himself there. Instead, he was frisked, handcuffed, and put into the backseat of the squad car.

¶ 12. The location of Uhlenberg's interview and the nature and degree of restraint of his movements during his time at the interview confirmed the impression that he was not free to leave. At the police department, Uhlenberg was taken directly into the secured area, which no one may enter or exit without police supervision, and within that secured area he was escorted to an even more secure location, the locked interview room. His handcuffs were then removed, but the door was locked from the outside, and he was left to wait in the small, locked room with no clear indication of when the questioning would begin. Soon the same detective who had taken him from his home entered the locked room and began to talk to Uhlenberg. When Uhlenberg wanted a drink, the detective opened the

door with his electronic key, escorted him over to the water fountain, and escorted him back into the locked interview room.

■■

¶ 13. We think no reasonable person in these circumstances—taken from home to the police department in handcuffs in a squad car, escorted into the booking area in handcuffs, placed in a locked interview room with little information about the reasons for the interview or when it might start, having a police escort in and out of the locked room to get water or use the toilet—would have felt free to end the questioning and leave the interview. *See Martin*, 343 Wis. 2d 278, ¶¶ 33, 35; *compare Mosher*, 221 Wis. 2d at 206–07, 211–12, 219 (holding that a suspect was not in "custody" when he rode to the police station with an officer voluntarily, sat in the front seat of the squad car, exited the squad car on his own, walked into the station voluntarily, and was interviewed in an unlocked room). So, Uhlenberg was in "custody" during the interrogation. And when he said, "I am not going to say another word, and I want an attorney," the detective had to stop the questioning.

¶ 14. Uhlenberg's invocation was even clearer than the invocation that a federal court recently declared to be unequivocal. *See Saeger*, 2013 WL 812547, at *2, *8 (granting habeas corpus because detectives asked more questions after defendant said "I got nothin[g] more to say to you. I'm done. This is over.") It follows that all the statements Uhlenberg made in response to the detective's interview questions after invoking his right to counsel, in even plainer terms, must be suppressed.

■

¶ 15. The opposite is true, however, with regard to the statements Uhlenberg made during his failed sui-

54

cide attempt, when an officer watching the monitor of Uhlenberg alone in the interview room witnessed Uhlenberg removing his shoelaces and worried (correctly, it turns out) that he was going to strangle himself. The statements Uhlenberg made to the rescuing officer in that situation were not custodial interrogation because they fell within the "private safety" exception to the *Miranda* rule. This exception provides that if questioning occurs during an emergency involving the possibility of saving human life, and rescue is the primary motive of the questioner, then no violation of *Miranda* has occurred. *See State v. Kunkel*, 137 Wis. 2d 172, 189, 404 N.W.2d 69 (Ct. App. 1987). In other words, an officer rushing to rescue someone from potentially lethal harm need not stop to determine whether a question might lead the defendant to incriminate himself.

¶ 16. We reject Uhlenberg's argument that the "private safety" exception should not extend to risks of harm to the defendant in addition to a third person. Instead we agree with the numerous jurisdictions holding that there is no legitimate reason not to apply the "private safety" exception to situations in which the defendant is at risk of harm. The interest in preserving the defendant's life is a pressing human interest, one that "outweighs the need for the prophylactic" *Miranda* rule. *See People v. Stevenson*, 59 Cal. Rptr. 2d 878, 880–81 (Cal. Ct. App. 1996); *see also State v. Betances*, 828 A.2d 1248 (Conn. 2003); *Benson v. State*, 698 So. 2d 333 (Fla. Dist. Ct. App. 1997).

¶ 17. We also reject Uhlenberg's argument that the police officer had no urgent need to ask him what he was doing with the shoelaces. An officer observing a defendant making moves as if to try to kill himself is justified in rushing to the scene and asking related

55

questions without stopping to second-guess himself about whether those questions would cause the defendant to incriminate himself. The point of the "private safety" exception is that such a situation cannot properly be characterized as "custodial interrogation."

¶ 18. In summary, we hold that Uhlenberg's statements during the custodial interrogation in the interview room, after his invocation of his right to counsel, must be suppressed, but that his statements during the shoelaces incident were not made during custodial interrogation. Thus, upon remand, while Uhlenberg's statements during the interrogation are suppressed, Uhlenberg's statements during the transport to the department, the phone call with his wife, and the attempted suicide should all be admitted.

*By the Court.*—Judgment reversed and cause remanded with directions.