STATE of Wisconsin, Plaintiff-Respondent,

v.

Brian T. PHEIL, Defendant-Appellant. †

Court of Appeals

*No. 89-0179-CR. Orally argued September 12, 1989.—Decided October 3, 1989.*

(Also reported in 449 N.W.2d 858.)

† Petition to review denied.

For defendant-appellant there was a brief submitted by and oral argument by *Richard S. Gondik, Jr.* of *Peterson, Cirilli, Moran & Gondik* of Superior.

For plaintiff-respondent there was a brief submitted by *Donald J. Hanaway,* attorney general, and *Christopher G. Wren,* assistant attorney general, and oral argu-

ment by *Christopher G. Wren* of Wisconsin Department of Justice of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Brian T. Pheil appeals a judgment of conviction on charges of being a party to the crimes of first-degree murder, armed robbery, burglary, and theft. He contends that the trial court erred by failing to suppress certain statements he made to the police after he had invoked his rights to remain silent and to counsel. Because Pheil later waived his rights to remain silent and to counsel and volunteered the statements, we reject his arguments. He also contends that the trial court abused its discretion by not ordering a change of venue. We conclude that there was no abuse of discretion and therefore affirm the conviction.

John Ennis was killed in Superior, Wisconsin, on June 18, 1987. Pheil, then seventeen, broke into his neighbor Ennis' house with Vincent Dyleski, another juvenile, and Randall Rasmussen. They were low on cash and intended to rob Ennis. When they discovered an inebriated Ennis in his house, they beat him, discharged a fire extinguisher in his face, stabbed him in the chest and throat, and strangled him with a vacuum cleaner cord.[1] The latter injury was found to have caused his death. After the murder, they robbed the home taking personal property worth approximately $6,000.

Rasmussen and Dyleski also took Ennis' car and fled the state. Pheil chose to remain in Superior. The three had not been particularly careful about concealing their roles in the murder and robbery, and police soon

---

[1] Which of the three men committed which acts was hotly disputed at trial. For the purposes of this appeal, however, it is only material that Pheil was convicted of being a party to first-degree murder.

received information that Pheil had been involved in the crime. On the same day as the murder, the police picked up Pheil and asked him to come to the station for questioning. Van Turner, a family friend whom Pheil referred to as his stepfather, met Pheil at the station. Turner was present throughout the questioning. The police gave Pheil an opportunity to read his *Miranda*[2] rights and then read and explained these rights to him. Afterwards, Pheil signed a waiver form.

During the initial interview on June 18, Pheil told the police he had seen two people driving away from the victim's home in the victim's automobile at about 5:30 a.m. After a break in the questioning, Pheil asked to end the interview and leave, but he was warned that if he did so he could be arrested for obstructing justice. Pheil stayed, and the police continued questioning him after again reading him his *Miranda* rights.

During this second round of questioning, Pheil's story changed. He told police that he had seen Rasmussen and Dyleski break into the Ennis home and had observed Rasmussen and Ennis struggling. Later, he saw Rasmussen and Dyleski take some items from the home to Ennis' car and drive away. In response to continued questioning, Pheil elaborated on the above story but did not change it in substance.

At about 9 p.m. the questioning terminated. The police asked Pheil to surrender his clothing and shoes and told him not to leave the general area. The police also instructed Turner to keep a close watch on Pheil. Pheil then turned over his clothing and left the police station wearing other clothes that Turner had provided for him.

---

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).

On the following day, Friday, June 19, the police contacted Turner and asked him if Pheil would be willing to give them a further statement. Turner told them he would try to find Pheil and convince him to talk to the police. Later that day, Pheil and Turner went to the police station. Pheil told the police he wished to have an attorney present before he talked any further. The police gave him the telephone number of the public defender's office, but Turner was unable to schedule a meeting with an attorney until Monday. Pheil was allowed to leave the station.

On June 20, Pheil contacted the police to complain about threats being made against him by the victim's family. He did not give any further statements. Also on that date, Rasmussen and Dyleski were arrested in Houston, Texas.

The next day, two police officers went to the home of Pheil's girlfriend, where Pheil was currently living, and asked to talk to him. They informed him that Rasmussen and Dyleski had been arrested and were implicating him in the murder. Pheil, through Turner, advised the officers that he wanted an attorney present before talking to the police. The officers left without obtaining a statement.

About one and one-half hours later, Turner called the police station. The investigating officer returned his call, and Turner notified him that Rasmussen had contacted Pheil. The officer suggested that Pheil come down to the station and discuss the crime. Around noon, Pheil, his mother, and Turner appeared at the station. Pheil waived his *Miranda* rights and gave a further statement indicating that he had witnessed the murder and robbery, although he was not a direct participant in the crimes. At about 8 p.m., he gave a further statement

528

reiterating his previous story. Pheil was eventually charged in the murder and robbery.

Pheil filed a motion to suppress the statements he had given to the Superior police during the period of June 18-22. The trial court suppressed the June 18 statements from the time Pheil asked to terminate the interview until he was allowed to leave the station. It, however, admitted the other statements made on the following days.

Pheil also moved to change the venue of the trial. The court refused that motion, but did agree to select a jury from outside Douglas County. It is these two rulings that are the subject of this appeal.

## STANDARD OF REVIEW

The standard of review which we must utilize may vary and depends upon the circumstances. In general, we are bound not to upset the trial court's findings of historical or evidentiary fact unless they are contrary to the great weight and clear preponderance of the evidence. This is basically a "clearly erroneous" standard of review. Questions of law require independent appellate review, while questions of constitutional fact are also subject to independent review and require an independent application of the constitutional principles involved to the facts as found by the trial court. The reviewing court has the duty to apply constitutional principles to the facts as found in order to ensure that the scope of constitutional protections does not vary from case to case.

As such, we are permitted to independently determine from the facts as found by the trial court whether any time-honored constitutional principles were offended in this case. This is true whether we are examining the voluntariness of defendant's consent to search or whether we are deciding if defen-

dant's confession was voluntarily procured. Independent appellate review is also required in determining whether the defendant's right to silence has been scrupulously honored since that inquiry requires an application of constitutional principles to the facts as found.

*State v. Turner,* 136 Wis. 2d 333, 343-44, 401 N.W.2d 827, 832-33 (1987) (citations omitted).

## RIGHT TO REMAIN SILENT

Pheil contends that all of his statements made after he attempted to terminate the interview on June 18 should be suppressed. The trial court did suppress statements made on June 18 after Pheil sought to end the interview and was informed that if he did so, he would be arrested for obstructing justice. However, the trial court allowed statements made on June 21 and 22 into evidence on the grounds that a significant amount of time had passed and that Pheil had been released from custody in the interim and had voluntarily returned to the police station to make a statement. We agree with the trial court's ruling.

The fifth amendment to the United States Constitution and art. I, sec. 8, of the Wisconsin Constitution protect one's right to remain silent. The Wisconsin Supreme Court interprets this right coextensively under both documents.[3] *Miranda* and its progeny are aimed at

---

[3] This court stated in *Hoyer v. State* . . . "Sec. 8 [art. I of the Wisconsin Constitution] corresponds in substance with art. V and sec. 11 is identical with art. IV, respectively, of the amendments to the United States Constitution." This court in *Hoyer* squarely aligned itself with the rulings of the United States Supreme Court . . .. We see no reason to deviate from that legal position in this case.

dispelling the compulsion inherent in custodial surroundings. *Id.* at 458. Thus, the *Miranda* safeguards apply only to custodial interrogations.

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by the virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason,* 429 U.S. 492, 495 (1977); *see Oregon v. Elstad,* 470 U.S. 298, 309 (1985).

██ It is not seriously disputed that Pheil was in custody once police stated he would be arrested for obstruction of justice if he attempted to leave during the June 18 interrogation. Continued questioning in that situation, once Pheil had invoked his right to terminate the conversa-

*State v. Hanson,* 136 Wis. 2d 195, 217, 401 N.W.2d 771, 780 (1987) (quoting *Hoyer,* 180 Wis. 407, 411, 193 N.W. 89, 91 (1923)).

tion, was clearly a violation of his constitutional rights. The trial court correctly suppressed those statements taken on June 18 after Pheil invoked his right to remain silent.

Pheil was released several hours later. Three days later, on June 21, he voluntarily returned to the station with Turner to give a statement. The trial court admitted those statements based on the analysis set out in *Michigan v. Mosley,* 423 U.S. 96 (1975), and adopted in *Wentela v. State,* 95 Wis. 2d 283, 290 N.W.2d 312 (1980), and *State v. Hartwig,* 123 Wis. 2d 278, 366 N.W.2d 866 (1985). The court examined the applicable factors identified in those cases and, relying largely on the facts that a significant amount of time had passed between the interrogations, that Pheil had voluntarily come to the police station, and that he had been adequately told of and waived his constitutional rights, the trial court admitted the statements.

Although we agree with the trial court's resolution of this issue, we do not find it necessary to reach the *Mosley* analysis. *Mosley* is applicable only in determining when, and under what conditions, it is proper to resume a *custodial interrogation* after the right to remain silent has been invoked. *Id.* at 103–106. Pheil returned to the station on June 21 of his own accord. He was read his *Miranda* rights, gave his statement, and left. He was free to end the conversation and leave the station at any time. This was not a custodial interrogation.

Pheil attempts to circumvent this problem by arguing that he was in "constructive custody" the entire period from June 18 through June 22. He relies on the fact that the police told him not to leave the area, and that the police told Turner to keep a close watch on him.

Pheil cites no law for the proposition that an admonishment not to leave the area suffices to establish custody. In addition, the record contains no indication that Pheil desired to leave the area, that a suitable arrangement could not have been worked out if Pheil had wished to leave the area, or that there would have been any consequences to violating the police warning. This was not a significant deprivation of Pheil's freedom of action sufficient to establish custody and trigger *Miranda.*

Pheil also claims that the police instruction that Turner keep a close watch on him and the police contacts with Turner throughout the weekend converted Turner into a police agent. Pheil argues that Turner, as a police agent, kept him in constructive custody throughout the weekend. Again, these actions fall short of establishing custody.

Pheil asks us to hold that Turner was an agent of the police for keeping him in custody. We need not state that this can never be the case. There are fact scenarios, particularly with juveniles, where such a finding may be appropriate. That is not the case here. Pheil was seventeen years old and no longer lived at home (although he did spend a considerable amount of time there). Turner was not Pheil's legal guardian. There is no evidence that Turner attempted to restrain Pheil's freedom of action in any way. Turner did repeatedly advise Pheil to tell the police what he knew of the Ennis murder. These particular circumstances do not establish agency for the purposes of holding Pheil in custody.

Therefore, we hold that since the statements of June 21 and 22 were not the products of a custodial interrogation, Pheil's right to remain silent was not compromised. There are no grounds here to suppress the statements.

## RIGHT TO COUNSEL

Pheil claims his fifth amendment right to counsel[4] was violated.[5] The right to counsel and the right to remain silent are not identical. Invoking the right to remain silent does not prevent a suspect from being reinterrogated under certain circumstances, while invoking the right to counsel prevents reinterrogation unless an attorney is provided or unless the suspect reinitiates the conversation. *Turner,* 136 Wis. 2d at 346–47, 401 N.W.2d at 833–34.[6] Both rights, however, are only relevant in the context of a custodial interrogation.

As we noted earlier, Pheil was only in custody for approximately two hours on June 18. For the remainder of the time in question, he was free to come and go as he pleased. Pheil did not mention his desire for counsel until he voluntarily went to the police station on June

---

[4] This right is also coextensive with the rights granted by the Wisconsin Constitution. *See* note 3.

[5] Pheil also claims that he was deprived of his sixth amendment right to counsel. This right only attaches, however, after the government initiates adversarial proceedings by a formal charge, preliminary hearing, indictment, information, or arraignment. *State v. Middleton,* 135 Wis. 2d 297, 306–07 n. 3, 399 N.W.2d 917, 921 n. 3 (Ct. App. 1986); *see Patterson v. Illinois,* 108 S. Ct. 2389, 2401 (1988). It is undisputed that at the time of the statements none of these procedural steps had occurred. Accordingly, Pheil remained at most a suspect, and the sixth amendment right to counsel is inapplicable.

[6] In *Turner,* the Wisconsin Supreme Court directs us to apply the earlier-mentioned *Mosley* factors to claims of violations of the right to silence while applying the per se rule set down by the United States Supreme Court in *Edwards v. Arizona,* 451 U.S. 477 (1981), to claims based on a violation of the fifth amendment right to counsel.

19. In response, the police provided him the card of the public defender's office. The police did not take any statement on that occasion or make any effort to prevent Pheil from leaving. Pheil *never* invoked his right to counsel in a custodial situation.

> The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that [defendant] invoked and there would be no occasion to determine whether there had been a valid waiver.

*Edwards,* 451 U.S. at 485-86. Because there was no custodial interrogation, we need not address whether there was a valid waiver of this right.

### VOLUNTARINESS OF STATEMENTS

■

The question of whether Pheil's statements were voluntary is separate and distinct from that of whether police adequately informed him of his fifth amendment *Miranda* rights. The fourteenth amendment prohibits involuntary statements because of their inherent unreliability and the judicial system's unwillingness to tolerate illegal police behavior. *State v. Kunkel,* 137 Wis. 2d 172, 191, 404 N.W.2d 69, 77 (Ct. App.), *cert. denied,* 108 S. Ct. 297 (1987). Determination of whether a statement is voluntary requires a balancing of the personal characteristics of the defendant against the coercive or improper police pressures. *State v. Clappes,* 136 Wis. 2d 222, 239, 401 N.W.2d 759, 767 (1987). However, we do not reach this balancing unless there is some improper or coercive conduct by the police. *Id.* at 240, 401 N.W.2d at 767; *see Colorado v. Connelly,* 479 U.S. 157 (1986). The trial

535

court found that there was no improper or coercive police conduct, and we agree.

The conduct complained of here is largely the constant urging by the police, through Turner, that Pheil discuss the murder with them. "A simple request to cooperate is not to be deemed as coercive." *State v. Lampe,* 119 Wis. 2d 206, 216, 349 N.W.2d 677, 682 (1984). Furthermore, almost all the pressure on Pheil was allegedly brought about by Turner's repeated advice to cooperate with the police. The primary purpose of the rule against involuntary statements is the prevention of police misconduct. For the rule to be applicable, we must find Turner to be an agent of the police.

Our supreme court has articulated a number of factors to be considered in determining whether a civilian has become an agent of the police:

> Although each case must be decided on the basis of the totality of circumstances present, courts should consider a number of factors. The importance to be attached to each must be considered in light of all the facts present. Among those factors to be considered are the following: 1) whether it was the citizen or the police who initiated the first contact with the police; 2) whether it was the citizen or the police who suggested the course of action that was to be taken; 3) whether it was the citizen or the police who suggested what was to be said to the suspect; in other words, was the citizen, in essence, a message carrier for the police; 4) whether it was the citizen or the police who controlled the circumstances under which the citizen and the suspect met; whether the control was extensive or incidental . . ..

*State v. Lee,* 122 Wis. 2d 266, 276–77, 362 N.W.2d 149, 153 (1985) (citations omitted).

 Whether an individual is acting as a police agent is a question of law that we review without deference to the trial court. *Id.* at 276, 362 N.W.2d at 153. After examining these factors, we conclude that Turner was not an agent of the police. The degree of police involvement in the conversations was qualitatively higher in *Lee.* In that case, the stepmother was an agent of the police for the purposes of interrogating her jailed stepson. The woman was allowed into the jail after visiting hours and told to give her stepson an ultimatum: Either he talk to the police in ten minutes or he "was going to serve a lot of time." *Id.* at 271, 362 N.W.2d at 151. In contrast here, neither Turner nor Pheil was under police control, and Turner, while acting as a conduit for police requests, had his own motivations for giving the advice and had given the same advice prior to any police involvement. He did not communicate any improper threats or promises. Turner was not a police agent, there was no coercive or improper police behavior, and, accordingly, the statements meet the fourteenth amendment test for "voluntariness."

## CHANGE OF VENUE

Finally, Pheil protests the Douglas County venue asserting that it was impossible to get a fair trial in that location. We disagree because selecting a jury from Polk County and the opportunity to voir dire the prospective jurors eliminated any prejudicial effects that could have potentially been caused by bias in Douglas County.

A motion for a change of venue is addressed to the sound discretion of the trial court and will be granted if there is a reasonable likelihood that a fair trial cannot be had. This court independently evalu-

ates the evidence and documents presented in support of the motion. Any doubt on this matter should be resolved in favor of the defendant. The factors which this court is obliged to consider in determining whether a change of venue ought to have been granted because of community prejudice are:

[T]he inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on *voir dire*. In addition, courts have also considered the participation of the state in the adverse publicity as relevant, as well as the severity of the offense charged and the nature of the verdict returned.

*Holland v. State,* 87 Wis. 2d 567, 576–77, 275 N.W.2d 162, 167 (Ct. App.), *rev'd on other grounds,* 91 Wis. 2d 134, 280 N.W.2d 288 (1979) (footnotes omitted). Our independent examination of these factors leads us to uphold the trial court's actions.

There was a great deal of publicity about this case in the Superior area. However, the murder did not receive heavy publicity in Polk County, where the jury was drawn. Only one prospective juror had any knowledge of the case. The voir dire did not turn up any evidence that would suggest any prejudice at the outset of the trial. [7]

---

[7] Pheil at one point alleges that it was improper to select a jury from Polk County as the assistant district attorney had family ties there. However, he fails to argue this point in his brief. Arguments raised but not argued need not be considered. *Reiman Assoc. v. R/A Advertising, Inc.,* 102 Wis. 2d 305, 306 n. 1, 306 N.W.2d 292, 294 n. 1 (Ct. App. 1981).

Pheil's major argument on this point is that even if the jury was unbiased prior to the trial, once they entered into the charged atmosphere of the Douglas County courthouse, they became tainted by the surroundings. Pheil cites two Kentucky cases [8] for the proposition that selecting a jury from another county is not always sufficient to guarantee a fair trial. We certainly agree in theory. In cases where there are repeated outbursts in the court or lynch mobs in the streets, a change of venue may be necessary. There is no such evidence here.

Pheil points to three occurrences that might have prejudiced the jury. First, people were checked at the door for security purposes. Second, the victim's family was present in the courtroom. Third, a member of the victim's family allegedly threatened Pheil. These examples do not rise to a level where we would overrule the trial court's discretionary determination. There is no evidence that the jury observed, much less was influenced by, any of these events. It is undisputed that the threat occurred outside the presence of the jury. It is also merely conjecture that security would not have been required in another venue or that the victim's family would not have observed the trial. The record fully supports the trial court's discretionary decision to hold the trial in Douglas County with a jury drawn from Polk County.

*By the Court.*—Judgment affirmed.

---

[8] *Bradley v. Commonwealth,* 265 S.W. 291 (Ky. 1924); *Shipp v. Commonwealth,* 99 S.W. 945 (Ky. 1907).