State of Wisconsin, Plaintiff-Respondent,
v.
Lamar S. Westbrook, Defendant-Appellant.
No. 2005AP1729-CR.
Court of Appeals of Wisconsin, District I.
October 24, 2006.
Before Fine, Curley and Kessler, JJ.
PER CURIAM.
¶1 Lamar Westbrook appeals from a judgment convicting him of one count of first-degree reckless homicide. He contends that the circuit court erred in denying his motion to suppress certain statements he made to police because the statements were not voluntary and did not represent his judgment or his will. Because we conclude that the circuit court did not err in denying the motion, we affirm the judgment.

1. Background
¶2 The criminal complaint initiating this case charged that on July 20, 2003, Westbrook arrived at an altercation on a residential street between certain families. Several women were fighting, and Westbrook, who claimed to be a cousin of one of the combatants, shot at a group of fifteen people standing on a porch who Westbrook believed were involved in the alleged physical altercation with his cousin. Westbrook, armed with a semi-automatic pistol, fired six shots, one of which killed 12-year-old Latara Darcy. A warrant was issued for Westbrook's arrest on July 24, 2003.
¶3 Police arrested Westbrook on July 30, 2003, at approximately 9:30 p.m. Detective David Salazar and his partner, Detective Alfonso Morales, interviewed Westbrook about the incident from about midnight until 4:33 a.m. on July 31, 2003. Detective Salazar testified at Westbrook's preliminary hearing that Westbrook made the following statements during the interview: Westbrook explained to police that after his release from prison in Illinois on March 26, 2003, he returned to Wisconsin where he moved in with family members. Westbrook told police that he purchased a handgun on the street for $100 about one month before the incident. Westbrook admitted to smoking two "blunts" of marijuana and drinking a pint of liquor before the incident. Westbrook expressed remorse for the shooting but claimed that he fired his handgun because he observed a man on the porch pointing a gun at him. After the shooting, Westbrook ran away, dumping the gun as he ran.
¶4 The circuit court bound Westbrook over for trial and Westbrook moved to suppress the statements he made to police following his arrest. Following an evidentiary hearing, the circuit court denied the motion. Westbrook subsequently entered a guilty plea to one count of first-degree reckless homicide while armed with a dangerous weapon. The circuit court sentenced Westbrook to forty-two years of imprisonment, consisting of twenty-five years of initial confinement and seventeen years of extended supervision. Westbrook appeals.

2. Suppression Hearing
¶5 Detective Salazar testified at the Miranda-Goodchild[1] hearing conducted by the circuit court on Westbrook's suppression motion. He stated that he interviewed Westbrook for approximately four hours in an interrogation room following his arrest. Detective Salazar testified that Detective Morales gave Westbrook his Miranda warnings from a preprinted State of Wisconsin Department of Justice card and that Westbrook indicated he understood them and did not want to speak with an attorney. Detective Salazar stated that Westbrook stated he was willing to give a statement. Detective Salazar also testified that Westbrook denied being under the influence of alcohol or drugs.
¶6 Detective Salazar took down Westbrook's statement in a summary form. He told the court that Westbrook was coherent, cogent and not confused. Detective Salazar testified that Westbrook reviewed the statement at the end of the interview, stated that it was correct but refused to sign it. Detective Salazar reported that the detectives provided Westbrook with juice, coffee, cigarettes, and four breaks during the interrogation. Detective Salazar indicated that Westbrook was not handcuffed during the interview and did not complain of any injuries or physical discomfort during the interview.
¶7 On cross-examination, Detective Salazar stated that he told Westbrook that he had been identified by witnesses as the shooter. Detective Salazar admitted that he did not tell Westbrook that some witnesses claimed Westbrook fired in self-defense or that the District Attorney's office would proceed more leniently if it viewed the matter as a self-defense case. Detective Salazar also admitted to touching Westbrook on the knee to express sympathy.
¶8 In its bench decision, the circuit court found that the officers interviewed Westbrook for approximately four hours after first giving him his Miranda rights. The circuit court found that Detective Salazar credibly testified that Westbrook said he understood his rights, that he had been read his rights on previous occasions and that he was willing to make a statement. The circuit court concluded that the State showed that Westbrook was fully advised of his rights, that he understood them, and freely and knowingly waived them.
¶9 The circuit court found that there was no evidence of improper influence or threats by police of Westbrook during his interview. The court noted that an interview of four hours was "not out of the ordinary ... in a serious case." The court also noted that Westbrook was provided with "certain creature comforts," including a "proper number of breaks." In light of the totality of the circumstances, the court concluded as a matter of law "that the statements made by Mr. Westbrook to Detective Salazar, Detective Morales, were the voluntary product of a free and unconstrained will reflecting deliberateness of choice."

3. Analysis
¶10 When we review an order denying a motion to suppress a defendant's statements, the evidentiary or historical facts found by the trial court will be upheld unless they are against the great weight and clear preponderance of the evidence. State v. Kruse, 175 Wis. 2d 89, 94, 499 N.W.2d 185 (Ct. App. 1993). Decisions on the credibility of the witnesses are strictly for the trial court's determination. See State v. Echols, 175 Wis. 2d 653, 671, 499 N.W.2d 631 (1993). Whether the facts found by the trial court satisfy constitutional principles is subject to independent appellate review. Kruse, 175 Wis. 2d at 94.
¶11 To prove that a defendant waived his or her rights against self-incrimination, the State must make a two-part showing: first, that the defendant was advised of his or her constitutional rights, understood those rights, and intelligently waived those rights; and, second, that the defendant's statements were voluntary. State v. Mitchell, 167 Wis. 2d 672, 696, 482 N.W.2d 364 (1992). To demonstrate the voluntary nature of the defendant's statement, the State must show by the greater weight of the credible evidence that the defendant was willing to give the statement and that the statement was not the result of duress, threats, coercion, or promises. State v. Lee, 175 Wis. 2d 348, 360, 365, 499 N.W.2d 250 (Ct. App. 1993).
¶12 "Determination of whether a statement is voluntary requires a balancing of the personal characteristics of the defendant against coercive or improper police pressures." State v. Pheil, 152 Wis. 2d 523, 535, 499 N.W.2d 858 (Ct. App. 1989). The balancing need not be done, however, "unless there is some improper or coercive conduct by the police." Id.
¶13 Westbrook contends in his brief that Detective Salazar's failure to disclose that certain witnesses to the incident claimed Westbrook shot at the people thronged on a porch in self-defense "resulted in a situation where Westbrook did not give a statement that was the product of a free and informed will." He also contends that Detective Salazar's summary is suspect because it was an unsigned summary and not a word-for-word compilation of Westbrook's statement. We are not persuaded.
¶14 Westbrook's contention that Detective Salazar improperly withheld witness statements from him during the interview lacks merit. Detective Salazar accurately conveyed to Westbrook that he had been identified and that certain evidence pointed to him as the person who fatally shot Latara Darcy. While the detectives did not convey evidence tending to exonerate Westbrook, we are unable to discover case law stating that such an affirmative duty exists. As the State argues, courts permit the broad use of active deception by police, including lying by interrogators, before finding involuntariness. Cf. United States v. Rodgers, 186 F. Supp. 2d 971, 980 (E.D. Wis. 2002) (detective's lie that defendant's fingerprints were found on the contraband did not render the confession involuntary). We conclude that the record is insufficient to support the conclusion that Detective Salazar improperly withheld information from Westbrook or otherwise engaged in coercive or improper police pressure. Accordingly, we conclude as a matter of law that Detective Salazar's interview tactics did not render Westbrook's confession involuntary.
¶15 We further conclude that Westbrook's refusal to sign the statement prepared by Detective Salazar was immaterial to whether he waived his rights. See Kutchera v. State, 69 Wis. 2d 534, 545-46, 230 N.W.2d 750 (1975) (the fact that a statement is not signed is not significant where defendant has adopted confession as his own). Detective Salazar testified that Westbrook reviewed the statement and orally attested to it. The circuit court specifically found Detective Salazar's testimony credible on this point. Accordingly, we are bound by the circuit court's finding that Westbrook adopted the July 31, 2003 summary as his own even though he did not sign it.
By the Court.Judgment affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436 (1966); State ex rel. Goodchild v. Burke, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).