**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 8, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2240-CR**

Cir. Ct. No. 2019CF397

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

GREGORY L. BOWIE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: ANTHONY G. MILISAUSKAS, Judge. *Affirmed*.

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Gregory L. Bowie appeals from a circuit court judgment convicting him of one count of possession of child pornography after he

entered a no-contest plea pursuant to an agreement with the State. He also appeals from an order denying his postconviction motion alleging ineffective assistance of counsel. Bowie's arguments on appeal all center on his assertions that his statements to law enforcement and evidence from his cell phone should have been suppressed, and his trial counsel was ineffective regarding her suppression attempts. For reasons set forth below, we affirm.

## BACKGROUND

¶2 The parties do not dispute the following relevant facts. Special Agent Nicolas Gates from the Wisconsin Department of Justice (DOJ) was assigned to investigate a CyberTip from the National Center for Missing and Exploited Children. The tip had been generated by the social media platform Pinterest. Pinterest had flagged several images of child sexual abuse material (CSAM) associated with a username of "gbowie" followed by several numbers. Gates discovered that "gbowie" had downloaded the CSAM material from an IP address that was traced to the home of a woman who was identified as Bowie's aunt.

¶3 Gates, who knew that Bowie had a lifetime registration requirement with the Sex Offender Registry Program (SORP), made contact with Bowie's aunt. The aunt told Gates that Bowie had stayed with her overnight a few times in the past but he did not live there, and he was not staying there anymore.[1]

---

[1] Bowie argues in his reply brief that the State's brief "contains numerous factual errors" and recites several alleged misstatements by the State. Although we direct all litigants to exercise candor to this court when characterizing the facts, on appeal we rely solely on undisputed facts or facts found by the circuit court under the proper exercise of its discretion.

¶4    We pause here briefly to discuss SORP.  SORP requires all registered sex offenders to provide specific personal information to "the department," defined as the Department of Corrections (DOC) by WIS. STAT. § 301.01(1) (2023-24),[2] on an annual basis.    WIS. STAT. § 301.45(3)(b)1. Section 301.45(2)(a) lists the information that must be provided, including "[a]ll addresses at which the person is or will be residing," § 301.45(2)(a)5., and "the name and Internet address of every public or private Internet profile [that] the person creates, uses, or maintains," § 301.45(2)(a)6m.  If a registrant's identifying information changes, he or she must provide DOC "with the updated information within 10 days[.]"  Sec. 301.45(4)(a).  A registered sex offender who "knowingly fails to comply with any requirement to provide information" required by § 301.45(2)-(4) is guilty of a Class H felony.  Sec. 301.45(6)(a)1.

¶5    Returning to the facts here, after failing to locate Bowie at his aunt's house, Gates visited the address in Racine that Bowie had provided in accordance with SORP.  Upon learning that Bowie no longer lived at the address he provided, Gates asked SORP to issue Bowie a letter requesting an updated address.  Bowie responded with a new address in Kenosha.

¶6    Gates decided to interview Bowie regarding the Pinterest tip about the CSAM downloaded by "gbowie."  While Gates and a detective from the Racine Police Department were at Bowie's workplace investigating the CSAM-tip, a search warrant authorizing the seizure of all electronic devices and their contents was being conducted at Bowie's home.  Gates, who was dressed in jeans and a t-shirt, asked an employee at Bowie's workplace if Bowie was

---

[2]  All references to the Wisconsin Statutes are to the 2023-24 version.

3

available to talk with Gates. Bowie was available, and Gates showed Bowie his DOJ badge.

¶7     According to Gates, due to the sensitive nature of the investigation, he asked Bowie if he would like to talk away from his workplace. Bowie agreed. He followed Gates to Gates' minivan, which was not marked as a law enforcement vehicle. Bowie was not handcuffed as he walked to the minivan. Once he reached the van, Bowie got into the passenger seat, while Gates sat in the driver's seat, and the Racine detective was in the backseat.

¶8     Gates asked Bowie about the Pinterest account with the flagged CSAM and about the email address linked to the Pinterest account. Bowie confirmed that the email address was, in fact, one he had created. He further confirmed that the Pinterest account tied to that email was one that he created and used. Gates understood that, given Bowie's confirmations and the information Gates had from the CyberTip, he had probable cause to arrest Bowie for possession of child pornography, but he did not do so at that point because of the warrant that was simultaneously being executed at Bowie's house.

¶9     Gates continued the interview with Bowie, requesting that he provide numbers for any cell phones that he used. As Bowie struggled to locate one of the numbers in a phone he had with him in the minivan, Bowie handed the phone to the detective so he could help Bowie. The detective ultimately retained the phone, over Bowie's objection, pursuant to the search warrant authorizing the seizure of electronic devices.

¶10     Using Gates' laptop, Gates showed Bowie two of the images that had been flagged in the CyberTip. Regarding one of the CSAM images, Bowie told Gates he thought the girl depicted was "16, 17[,]" which still constitutes

possession of child pornography, or "18, maybe[,]" but the girl was actually 12, which Gates knew because it is an image known to law enforcement where the victim had been identified. Gates informed Bowie about the search warrant and that the police would eventually take his phone and scan it for CSAM. Gates explained to Bowie that "why we're here to talk" is because "you have this social media account" and, in that account, "you have images of child pornography."

¶11    At the end of the interview in the minivan, Gates and the detective handcuffed Bowie and drove him to his house, where the search warrant was being executed.

¶12    A forensic examiner later analyzed Bowie's phone and found CSAM on it. Bowie was then arrested and charged with ten counts of possession of child pornography, all as a repeater. Through counsel, Bowie filed two suppression motions—one challenging the State's use of his statements as involuntary, and the other challenging the warrantless search of his cell phone. Counsel argued, in part, that the State obtained Bowie's statements in violation of his Fifth and Fourteenth Amendment rights. Following the evidentiary hearing, defense counsel argued that Bowie's incriminating statements were involuntary and that Gates obtained Bowie's statements in violation of *Miranda*.[3]

¶13    The circuit court denied both suppression motions. It found that Bowie voluntarily gave the statements, and the circumstances did not place him in a custodial setting for *Miranda* purposes. With regard to the seizure and

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966). The *Miranda* motion related only to the period in which Bowie was in the minivan but not handcuffed. The State conceded that all statements made after Bowie was handcuffed violated *Miranda*.

subsequent search of Bowie's cellphone, the court concluded "there was probable cause" at the time Bowie handed his phone to the detective for assistance. Alternatively, the CSAM inevitably would have been discovered. Bowie moved for reconsideration, which the court denied. In addition to having found probable cause to seize and search the phone, the court clarified that discovery of the images on the phone was inevitable because law enforcement would have seized Bowie's phone upon his arrest and subsequently obtained a warrant to search it.

¶14 Bowie then filed a complaint with the Office of Lawyer Regulation (OLR) about his initial attorney ("trial counsel"), who litigated the motion to suppress. He alleged that trial counsel "did not present the correct standard of review … regarding *Miranda* and custodial interrogations" and wanted an opportunity to testify at a new suppression hearing. He also argued that "under no circumstances would a reasonable person required to comply with the registry program feel free to just terminate the interrogation and leave knowing non-compliance is a [C]lass H felony." Bowie—through his fourth attorney—moved to reopen the suppression motion for the sole purpose of providing Bowie an opportunity to testify. After Bowie changed attorneys again, a new judge denied the motion to reopen.[4]

¶15 After the denial of his motion to reopen, Bowie entered a plea of no contest to one count of possessing child pornography as a repeater. The other nine charges were dismissed and read in at sentencing. The circuit court imposed initial confinement of four and one-half years and two years of extended

---

[4] The Honorable Mary Kay Wagner presided over the initial suppression motion hearing. The Honorable Anthony G. Milisauskas presided over the remainder of the pretrial proceedings, the plea and sentencing hearings, and postconviction matters.

supervision. It granted Bowie over four years of sentence credit, which resulted in him only serving approximately six months in confinement after sentence was imposed.

¶16 Through appellate counsel, Bowie filed a postconviction motion to withdraw his plea due to ineffective assistance of trial counsel. He argued that trial counsel raised the wrong suppression theories. Instead, Bowie asserted counsel should have argued that Bowie had self-executing immunity from prosecution because Gates compelled his statements by implicitly threatening him with prosecution under SORP, should he have invoked his Fifth Amendment right to silence. In other words, Bowie believed trial counsel should have filed another suppression motion arguing: "The State of Wisconsin exploited this [SORP] penalty provision to pressure Mr. Bowie into becoming a witness against himself in a criminal prosecution."

¶17 The circuit court held a hearing on Bowie's postconviction motion at which both trial counsel and Bowie testified. *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). Trial counsel summarized her suppression strategy, confirming that she tried to suppress Bowie's statements and the cell phone evidence through ***Miranda***. She recalled arguing the statements were involuntary, but did not recall making or considering the specific argument regarding coercion that Bowie now advanced, instead viewing SORP as a factor to use in the ***Miranda*** custody analysis but not as an independent basis for suppression.

¶18 The circuit court denied the postconviction motion. It rejected Bowie's testimony that he would not have entered a plea if trial counsel would have pursued the SORP-based, self-incrimination argument. The court observed

that Bowie was aware of the SORP argument at the time he wrote to OLR and, given that, he could have asked counsel to pursue that theory before entering a plea if he so desired. It further noted that Bowie drastically reduced his sentencing exposure by accepting the agreement, and he was released to extended supervision shortly after sentencing. The court found Bowie's testimony simply was not credible and there was no ineffective assistance of trial counsel. Bowie appeals.

¶19 We include additional facts as necessary to our discussion below.

## DISCUSSION

¶20 Although Bowie delineates several separate issues on appeal, he primarily focuses on his argument that trial counsel was deficient in failing to suppress his statements to law enforcement as compelled due to his legal obligation to provide the SORP information specified by statute. Bowie argues his statements were compelled because he could have been charged under the sex offender registry law for failing to provide the requested information had he invoked his Fifth Amendment right to silence during the discussion with Gates. Bowie also raises challenges to the voluntariness of his statements, argues his *Miranda* rights were implicated by Gates' questioning of Bowie, and asserts the statements and the cell-phone evidence should have been suppressed.

### I. *Ineffective assistance of counsel*

¶21 To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent

8

assistance." *Id.* at 690. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697.

¶22 As we now explain, because the law is at best unsettled, we conclude trial counsel did not perform deficiently in failing to file a motion to suppress Bowie's statements to law enforcement and the cell-phone evidence based on a legal theory that the evidence was compelled because the sex offender registry laws penalize the invocation of the Fifth Amendment. *See State v. Breitzman*, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93 (a defendant must show that trial counsel "failed to raise an issue of settled law" in order to establish ineffectiveness).

¶23 According to Bowie, trial counsel performed deficiently by not raising what he calls "a *Kastigar* claim" based on his SORP-compulsion theory of suppression. *See Kastigar v. United States*, 406 U.S. 441 (1972). In *Kastigar*, the Court concluded the government could compel a witness' testimony through a subpoena even after a witness had invoked his or her Fifth Amendment privilege of silence because the government granted them immunity pursuant to federal statutes. *Id.* at 442. It held that statutes compelling testimony upon a grant of immunity are generally lawful, as were the statutes at issue there. *Id.* at 448. Bowie effectively argues that, under *Kastigar*, the State must provide a grant of immunity for compliance with SORP provisions requiring certain potentially incriminating information and maintains that Gates implicitly compelled him to incriminate himself by referring to SORP's disclosure requirements. He claims on appeal that he should have been granted "self-executing" immunity even though

9

he never asserted his Fifth Amendment privilege while talking with Gates and the detective.

¶24 As the State aptly observes, *Kastigar* is inapposite. In Bowie's situation, the government never compelled him to speak through formal legal process such as a subpoena. Further, unlike *Kastigar*, Bowie never invoked his Fifth Amendment privilege during questioning. Instead, Bowie argues that Gates "implicitly compelled him" by referring to SORP's disclosure requirements such that he had to be granted "self-executing" immunity even though he failed to assert his Fifth Amendment privilege.

¶25 Bowie fails to convince us that settled law supports the theory that he faults trial counsel for not pursuing. Without settled law, Bowie cannot meet his burden of demonstrating that his trial counsel had a clear duty to pursue this theory in an attempt to suppress evidence. *See id.* To explain further, ineffective assistance of counsel claims "should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue." *State v. Lemberger*, 2017 WI 39, ¶33, 374 Wis. 2d 617, 893 N.W.2d 232 (citation omitted). The law is not clear or settled when "there is no Wisconsin case law directly on point on the issue" and existing case law does not "present a factual situation similar enough to the facts of [the] case." *State v. Morales-Pedrosa*, 2016 WI App 38, ¶26, 369 Wis. 2d 75, 879 N.W.2d 772.

¶26 Bowie has not demonstrated that settled law supported the suppression of the evidence. *Kastigar* is inapposite, and Bowie cites to no Wisconsin case that stands for the legal proposition he advances. He instead attempts to rely on a specific "penalty-case exception" relied on by Wisconsin courts in the probation context. *See State v. Spaeth*, 2012 WI 95, 343 Wis. 2d

220, 819 N.W.2d 769; *State v. Quigley*, 2016 WI App 53, 370 Wis. 2d 702, 883 N.W.2d 139; *State v. Peebles*, 2010 WI App 156, 330 Wis. 2d 243, 792 N.W.2d 212. It is unclear whether these cases apply to registered sex offenders under SORP—as stated, Bowie cites to no case that has done so. Trial counsel cannot be deficient for not raising a claim based on unsettled law. *See Lemberger*, 374 Wis. 2d 617, ¶18. Without settled law, Bowie cannot meet his burden of demonstrating that his trial counsel had a clear duty to pursue the theory that a sex offender registrant has an implicit "self-executing" privilege not to answer SORP-related questions. *See Breitzman*, 378 Wis. 2d 431, ¶49.

¶27 Citing *Minnesota v. Murphy*, 465 U.S. 420 (1984), the State further argues that under the current law, Bowie would not have been successful with suppression even if trial counsel had raised the argument Bowie now advances. The State argues that *Kastigar* does not apply to the facts presented here and *Murphy* is on point. To explain, *Murphy* involved a situation in which a probation agent learned that Murphy had admitted in treatment to committing a rape and murder seven years earlier. 465 U.S. at 423. Murphy was prosecuted for the rape and murder after the probation agent shared Murphy's admissions with law enforcement. *Id.* at 424. Murphy argued that his statements to the agent could not be used against him because they were compelled. *Id.*

¶28 The Supreme Court disagreed that Murphy's statements could not be used because they were unlawfully compelled, holding that "the general obligation to appear and answer questions truthfully d[oes] not in itself convert [a defendant's] otherwise voluntary statements into compelled ones." *Id.* at 427. It explained that the government has not compelled a witness' testimony when a witness "under compulsion to testify" makes incriminating disclosures rather than asserting his or her Fifth Amendment privilege. *Id.* (citation omitted). Wisconsin

courts have embraced ***Murphy***, explaining that "a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." ***State v. Mark***, 2006 WI 78, ¶26, 292 Wis. 2d 1, 718 N.W.2d 90 (quoting ***Murphy***, 465 U.S. at 429).

¶29 Bowie could have asserted his privilege against self-incrimination at any time during questioning by Gates. The fact that he chose not to assert it does not mean that the statements he gave Gates against his own interest must be suppressed. Bowie was entitled to remain silent and/or walk away from the minivan, taking his cell phone with him. Further, because the self-executing-immunity legal theory Bowie alleges trial counsel should have advanced is not a settled point of law, trial counsel was not ineffective in failing to make the argument.

*II.     Other issues*

¶30 Bowie also argues both that his incriminating statements were not voluntary because they were coerced and they were made in violation of ***Miranda***. As relevant to Bowie's arguments, ***Murphy*** identified two exceptions to its general holding as set forth above. The first exception is ***Miranda***. ***Murphy***, 465 U.S. at 429-30. "[T]his extraordinary safeguard" against incriminating oneself "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." ***Id.*** at 430 (citation omitted). The second exception is in "the so-called 'penalty' cases" in which the State not only compelled an individual to appear and testify, but also sought to induce him or her through threat of punishment. *See **id.*** at 434.

¶31    As noted in the previous section, Bowie has not demonstrated that the situation challenged here presents a penalty case. We therefore turn to Bowie's contentions that Gates' interrogation "tactic" of "request[ing] information from him while purposefully masquerading under the guise of SORP" constituted unlawful coercion, and his statements were involuntary and violated *Miranda*.

¶32    We first conclude that Gates' interrogation "tactic" falls short of clearing the "high bar" necessary to establish coercion. *See State v. Vice*, 2021 WI 63, ¶45, 397 Wis. 2d 682, 961 N.W.2d 1. "[I]t is settled law that police may engage in active deception, including lying to a suspect, without rendering that suspect's statement involuntary." *Id.* Similarly, we reject Bowie's claim that Gates "overbore [his] will." Whether "a defendant's will was overborne" goes to the voluntariness of the statement under the Fourteenth Amendment. *Id.*, ¶¶30, 45. Here, Gates candidly told Bowie of his suspicions and the reasons law enforcement was at Bowie's workplace looking into his email and Pinterest accounts. Bowie has failed to persuade us that Gates engaged in unlawful coercion.

¶33    Based on the facts found by the circuit court, we also conclude that Bowie has failed to establish that his statements were made in violation of his *Miranda* rights. *Miranda* requires law enforcement to inform a suspect of his or her right to remain silent and to have an attorney present before commencing a custodial interrogation. *State v. Bartelt*, 2018 WI 16, ¶27, 379 Wis. 2d 588, 906 N.W.2d 684. The State does not dispute that Gates' questioning of Bowie in the minivan constituted interrogation, but argues that it was not custodial. We agree with the State, as we now explain.

¶34     It is axiomatic that law enforcement must give certain warnings prior to a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966). These often-recited *Miranda* warnings inform suspects that they have the right to remain silent; that anything they say can be used against them in a court of law; that they have the right to have an attorney present; and that an attorney will be appointed prior to questioning if the suspects so desire and cannot afford an attorney. *Id.* at 444-45. Because "*Miranda* and its progeny are aimed at dispelling the compulsion inherent in custodial surroundings," the *Miranda* safeguards apply "'only to custodial interrogations' under both the U.S. and Wisconsin constitutions." *Bartelt*, 379 Wis. 2d 588, ¶30 (citation omitted).

¶35     When a person is subjected to a custodial interrogation, "[i]f the warnings are not given, any statements made are inadmissible in court." *State v. Halverson*, 2021 WI 7, ¶1, 395 Wis. 2d 385, 953 N.W.2d 847. Our supreme court has also concluded that "physical evidence obtained as the direct result of an intentional violation of *Miranda* is inadmissible under Article 1, Section 8 of the Wisconsin Constitution." *State v. Knapp*, 2005 WI 127, ¶83, 285 Wis. 2d 86, 700 N.W.2d 899.

¶36     The reason *Miranda* warnings must be given when a suspect is in custody and subject to interrogation is because the warnings are "aimed at dispelling the compulsion inherent in custodial surroundings." *State v. Pheil*, 152 Wis. 2d 523, 530-31, 449 N.W.2d 858 (1989). This is the rule under both the United States and Wisconsin Constitutions. *See id.* A circuit court determines whether a suspect is in *Miranda* custody based on an objective consideration of the totality of the circumstances. *Bartelt*, 379 Wis. 2d 588, ¶31. Relevant factors include, but are not limited to, "the degree of restraint; the purpose, place, and

length of the interrogation; and what has been communicated by police officers." *Id.*, ¶32.

¶37 Based on the totality of the circumstances and considering the relevant factors, we conclude that the circuit court did not erroneously determine that Bowie was not in *Miranda* custody until he was handcuffed. In the time before they entered the minivan, Bowie spoke with Gates outside his workplace, not in a stationhouse. *See Bartelt*, 379 Wis. 2d 588, ¶33 (holding even if a person is subject to formal arrest, the court must "consider whether 'the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" (citation omitted)). Bowie willingly followed Gates when asked if he would speak in his minivan, and had Bowie asked, Gates testified he would have found a private office within his workplace to meet.

¶38 In addition, Gates was wearing plain clothes, and the minivan was unmarked. Bowie sat in the front passenger seat next to an unlocked door, not in the rear seat of a locked squad car. Bowie was not restrained, searched, or handcuffed until the end of the interview. He was not impeded from exiting the vehicle whenever he wished.

¶39 We further observe that the interview in the minivan was relatively brief. Forty-six minutes and six seconds elapsed between Bowie's entrance into the minivan and his arrival at his home. The noncustodial portion of the conversation before Gates handcuffed Bowie was necessarily shorter than that, and an interview length of 30 minutes does not support a determination of *Miranda* custody. *See Bartelt*, 379 Wis. 2d 588, ¶38.

15

¶40    We conclude that no constitutional violation occurred because, based on the undisputed facts, Bowie was not in custody during Gates' questioning of him prior to his arrest.  Accordingly, the circuit court did not err in determining that his statements and the cell-phone evidence would be admissible if Bowie went to trial.

## CONCLUSION

¶41    Bowie has failed to establish ineffective assistance of counsel for failing to raise an unsettled legal theory under *Kastigar*.  Additionally, Bowie has not shown that his pre-custody statements and the cell-phone evidence were unconstitutionally obtained as coerced, involuntary, or in violation of *Miranda*.  Accordingly, Bowie is not entitled to withdraw his plea to possession of child pornography.  Therefore, we affirm the judgment of conviction and order denying Bowie's postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.